[Civ. No. 11963. Third Dist. Apr. 8, 1971.]

DIAMOND SPRINGS LIME CO., Plaintiff and Appellant, v.
AMERICAN RIVER CONSTRUCTORS, Defendant and Appellant;
PLACER COUNTY WATER AGENCY, Defendant and Respondent.

584

586

588

**COUNSEL**

Hughes, Maul, Fogerty & Dezzani, Robert Hoffman and Clyde Small for Plaintiff and Appellant.

Cushing, Cullinan, Hancock & Rothert, Thelen, Marrin, Johnson & Bridges, John Hancock, Barry L. Bunshoft, Edward J. Ruff, Jesse B. Grove III and Ira Brown for Defendant and Appellant.

Popelka, Graham, Hanifin, Van Loucks & Allard, Kronick, Moskovitz & Vanderlaan and Robert Humphreys for Defendant and Respondent.

**OPINION**

**FRIEDMAN, Acting P. J.**—In December 1964 several days of torrential rainfall created great pressure on the partially constructed Hell Hole Dam,

located on the Rubicon River, a tributary to the Middle Fork of the American River. The dam burst. Impounded water poured downstream and damaged a limestone quarry and rock-crushing plant situated on the Middle Fork. Diamond Springs Lime Company, operator of the quarry, brought this damage action against American River Constructors, the contractor building the dam, and Placer County Water Agency, owner of the dam.[1] A jury trial resulted in a verdict finding that ARC had been negligent and awarding damages against it. The jury exonerated Water Agency. ARC appeals from the ensuing judgment. Plaintiff has filed a cross-appeal from the judgment favoring Water Agency.

Hell Hole Dam was part of the Middle Fork American River Project being constructed by ARC under a contract between it and Water Agency. The contract was signed on May 2, 1963. The dam was to be of "dumped" rockfill construction. In the construction of such a dam an abutment is established on one side of the canyon across which the dam is to extend. From this abutment rock is dumped into a prepared foundation in the bed of the river canyon, forming a rock platform at the side of the canyon. From the end of this platform additional rock is dumped. The continued dumping extends a wall of rock across the canyon which eventually reaches the other side and completely blocks the river. The upstream and downstream faces of the wall slant inward from a broad base to a relatively narrow crest. The specifications for Hell Hole Dam called for an impervious membrane or core of clay, to be placed against the upstream face of the rockfill as a barrier against seepage through the interstices of the fill. To provide protection to the clay core, successive layers of sand and rock would then be placed along the upstream face of the dam.

The contract called for completion of the dam and an accompanying spillway by November 15, 1965. At completion the top of the dam would be at elevation 4,660, that is, 4,660 feet above sea level. Since construction would extend through one or more winter flood seasons, temporary diversion of the Rubicon River was necessary. The specifications called for a diversion tunnel having a minimum diameter slightly in excess of 13 feet. According to the original specifications, if the contractor elected to install the diversion tunnel and to extend the rockfill completely across the canyon before the 1964-1965 rainy season, the rockfill was to be brought to elevation 4,470 and the impervious core to an elevation of 4,468 by November

---

[1] American River Constructors is a joint venture. In this opinion we shall refer to it as "ARC" and to the Placer County Water Agency as "Water Agency." Another abbreviated label will be "MKE," which will refer to McCreary-Koretsky Engineers, an engineering firm hired by Water Agency to design the dam, prepare specifications, and superintend construction.

15, 1964.[2] At elevation 4,470 the top of the rockfill would be approximately 200 feet higher than the river bed.

The contract designated McCreary-Koretsky Engineers (MKE) as Water Agency's engineer for construction supervision. It empowered MKE to decide all questions as to acceptability of work, manner of performance and rate of progress. The project also evoked the statutory powers of the State Department of Water Resources. The Water Code (§ 6000 et seq.) directs the department to supervise the construction of dams and reservoirs; requires owners to seek the department's approval of dam construction; prohibits unapproved construction; provides for state inspection during construction and revision of the project if necessary to insure safety.

The dam's failure occurred on December 23, 1964. Because of various circumstances the anticipated progress had not occurred. The main body of rockfill extended completely across the canyon to the 4,470-foot elevation fixed by the specifications. The impervious clay core and its upstream protective elements were at elevation 4,300, that is, 168 feet below the anticipated height fixed by the original specifications. On December 19, a torrential rainstorm commenced. During a 5-day period the storm deposited approximately 22 inches of rainfall in the area upstream from the dam. The concrete diversion tunnel could not accommodate the flow. Water backed up in the canyon behind the dam, forming a large reservoir whose height overtopped the impervious core. On December 22 water commenced seeping through the rockfill and flowing from its downstream toe. By three o'clock on the afternoon of December 22 the reservoir behind the dam was at elevation 4,339 feet (i.e., 39 feet above the height of the clay core) and was flowing from the downstream face at elevation 4,285. At 5:30 a.m., December 23, rock commenced to slide away from the sloping downstream wall of the rockfill. As the pressure of impounded water mounted, the erosion and sliding continued. By 9:10 a.m. the reservoir behind the dam had attained elevation 4,400 feet; water was emerging on the downstream side at elevation 4,370 feet; continued erosion and sliding had created a large hollow in the downstream face of the rockfill. At approximately 9:30 a.m. the center section of the dam gave way completely. Impounded water poured through the breach. By 3:30 that afternoon the reservoir had emptied completely. The massive flow of water reached plaintiff's quarry some-

---

[2]At this point the contract specifications declared: *"Hell Hole Dam and Spillway:* The dam and spillway shall be completed by November 15, 1965. Construction of the dam embankment shall be performed in such manner that it shall at no time be subject to overtopping. If the Contractor chooses to completely block the river channel in the first year of dam placement, at the 15th of November of that year, the elevation of core and upstream shell shall be at least 15 feet higher than the reservoir stage resulting from the routing of the flood of record through the diversion works."

time after 1 p.m. It inundated and washed away part of the quarry's work area and portions of an access road, as well as plaintiff's rock-crushing and screening plant and allied equipment.

## Proof of Negligence, Causation and Damage

Pointing out that all its actions complied either with its original contract with the Water Agency or with agreed modifications, ARC contends that it was entitled to a directed verdict at the close of the plaintiff's case and that there was no substantial evidence to support the jury's finding of negligence. The contention is bottomed upon a rule of law which exempts a public works contractor from liability for damages to third parties when he has complied with plans which are not themselves obviously dangerous.

The rule in question is part of a larger doctrine, insulating a public works contractor from liability for project-caused injuries where he has complied with seemingly safe plans and specifications, but subjecting him to liability for injuries proximately resulting from his own negligence in performance of work. (*Heimann* v. *City of Los Angeles* (1947) 30 Cal.2d 746, 757 [185 P.2d 597]; *Smith* v. *Lockheed Propulsion Co.* (1967) 247 Cal.App. 2d 774, 787-788 [56 Cal.Rptr. 128, 29 A.L.R.3d 538]; *Hamilton* v. *Harkins* (1956) 146 Cal.App.2d 566, 573-574 [304 P.2d 82]; Note, 9 A.L.R. 3d 382.) Although frequently voiced as a principle applying to public works projects, the doctrine has approximately the same contours as that covering owners and contractors on private construction projects. (See *Chance* v. *Lawry's, Inc.* (1962) 58 Cal.2d 368, 379 [24 Cal.Rptr. 209, 374 P.2d 185]; *Dow* v. *Holly Manufacturing Co.* (1958) 49 Cal.2d 720, 724 [321 P.2d 736]; Prosser on Torts (3d ed. 1964) p. 695.)

Except when reasonable men cannot differ, negligence—that is, whether a person has acted as would a reasonably prudent man under the circumstances—is a question for the jury. (*Warner* v. *Santa Catalina Island Co.* (1955) 44 Cal.2d 310, 318 [282 P.2d 12].) When attacked on evidentiary grounds, a finding of negligence cannot be disturbed by a reviewing court if there is substantial evidence to support it; when two or more inferences are reasonably available from the facts, the reviewing court will not substitute its own inference for the jury's. (*Acosta* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 19, 27 [84 Cal.Rptr. 184, 465 P.2d 72]; *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [43 P.2d 183].)

This is not a case where "an accident is the result of work done by a contractor in conformity with plans and specifications . . . and is the result of fault in such plans and specifications. . . ." (*Johnson* v. *City*

*of San Leandro* (1960) 179 Cal.App.2d 794, 801 [4 Cal.Rptr. 404].) There was substantial evidence from which the jury could reasonably conclude that the failure of Hell Hole Dam resulted from ARC's active negligence in the performance of its work.

The project required the contractor to install access roads into the area; erect a campsite; install quarries as a source of rock; install a borrow pit five miles upstream from the dam site as a source of material for the impervious layer of clay; build "haul roads" from the quarries and borrow pit to the various elevations from which material was to be "tipped" or dumped; clear and prepare a foundation for the dam; construct a diversion tunnel and coffer dam. These various steps were to be synchronized by means of "critical path" schedules. These schedules would establish a range or spread of dates for the commencement and completion of the various steps. If a particular step was not commenced and completed within the permissible time range, the ensuing steps would be delayed, with the eventual result that desired stages could not be completed in time to avoid undesirable weather conditions, and completion of the project itself might be delayed.

From the inception of the work, ARC expected to "close the river" (i.e., build a diversion tunnel and place the rock wall and impervious core completely across the canyon) before the 1964-1965 rainy season. In May or June 1963 ARC commenced clearing the area, constructing access roads and putting up a campsite. Construction of haul roads from the aggregate sources to the dam site commenced. In the autumn of 1963 ARC commenced to clear and establish foundations for the dam. There is evidence that ARC spent almost a year doing foundation work which could have been completed within three months. Improper blasting techniques caused unsatisfactory fragmentation of rock at the quarry sites and delayed delivery of rock at the dam site. Actual dumping of rock did not commence until April 1964, only six months before the target date for closing the river. Although two and three-quarters million cubic yards of rock had to be placed by the November 15 target date, only 64,624 cubic yards had been produced by May 15. The borrow pit for clay was opened to drainage several months later than possible, and the drainage facilities were not adequate to produce clay of the desired dryness. A conveyor system was built to transport clay from the top of the canyon down to the dam site. The conveyor system was defective, never did work and was eventually abandoned. It became "important" to start pouring the clay core in July 1964. Clay could have been stockpiled before then, but was not. Although 438,-526 cubic yards of clay were to be poured in order to meet the November 15 target date, no clay was produced from the borrow area or placed at the dam site until August 1964.

By July 1964 it had become evident that ARC could not bring the clay core up to elevation 4,468 before the winter rains. At a meeting with MKE representatives in August ARC's construction managers proposed a revised program. According to that program, ARC would close the river by November 15 as originally planned; the main body of rockfill would be at elevation 4,470 as originally planned, but the clay core would be brought up only to elevation 4,350 or 4,370. MKE agreed to the revised program. The State Department of Water Resources conditionally approved it, wishing to review the situation when the dumped rock reached elevation 4,300 at the far side of the canyon.

In October the rockfill was at elevation 4,300 at the far abutment except for a triangular "V-notch," where the toe of its outward-slanting butt-end touched the base of the canyon. There was evidence that ARC could bring the clay core no higher than elevation 4,300 by November 15. Nevertheless, ARC's representatives desired to go ahead with the original plan of "closing the river," that is, of filling in the V-notch by November 15. In October MKE requested and received the oral concurrence of the State Department of Water Resources in ARC's proposal to close the V-notch, and in November the state agency's consent was confirmed by letter. Additional rock was then dumped, closing the V-notch, and the impervious core was extended across the upstream face of the rock wall at elevation 4,300.

Several engineering experts testified that had ARC been on schedule and brought the impervious clay core to elevation 4,468 before the December rainstorms, the dam would not have failed.[3] Four witnesses (Mr. Barrie, the resident project manager for ARC, and three engineering consultants) testified to the general effect that had the V-notch been left open, minor erosion of the rockfill might have occurred but no breach of the dam.

The evidence summarized above reasonably justified the jury in finding that ARC had been guilty of inefficiency and unreasonable delays which retarded progress of the project; that, in failing to bring the clay core up to the projected level and in deciding to close the V-notch prior to the winter rains, ARC had failed to exercise reasonable care to protect downstream property owners against a foreseeable breach of the dam. The evidence of negligence is substantial. In view of the rule imposing liability upon the contractor for its own negligence, the court did not err in denying a directed verdict.

 ARC contends that its inability to complete the first phase of con-

---

[3] Other experts called to the stand by ARC voiced contrary opinions. On appeal the reviewing court does not deal with conflicts in the evidence. Its factual review ceases when it finds substantial evidence, contradicted or not, to support the verdict. (*Acosta* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d at p. 27.)

struction by the November 15, 1964, target date was caused by the delay of MKE and of the State Department of Water Resources in approving its work schedule. The contract required ARC to submit for review by MKE a construction program showing the sequence of operations and the time span required for each step. MKE, in turn, sought approval by the state Department of Water Resources, the latter acting under its statutory powers. On May 31, 1963, ARC submitted its proposed construction program to MKE, which rejected it. A second program proposal was rejected in August, because of differences of opinion as to the height of the abutment from which rock was to be dumped. A plan submitted in November was disapproved by the state. Finally, in January 1964, ARC submitted a schedule which received approval by MKE and the state in March. ARC argues that prior to settlement of the controversy over the elevation of the dump point, it could not go forward with the necessary haul roads and with the dumping of rock.

In part, the argument is a claim of nonnegligence, in part a claim of lack of proximate cause. The fact is that the work was going forward while the parties were arguing over the work program. The fact is that all ARC's program proposals, including that of January 1964, contemplated closing the river at elevation 4,470 prior to the end of the year. Whether viewed as a negligence or proximate cause issue, the dispute as to the source and causes of delay presented a jury question. The jury's resolution of the issue, made upon conflicting evidence, is binding. (Cf. *Oakes* v. *McCarthy Co.* (1968) 267 Cal.App.2d 231, 248 [73 Cal.Rptr. 127].)

Sierra rainfall is the topic of ARC's next contention. █ It argues that the 1964 flood was an unprecedented, unforeseeable calamity; that it had no duty to safeguard downstream owners against this unforeseeable event; alternatively, that this unforeseeable event formed an independent superseding cause of plaintiff's damage, eliminating ARC's own negligence (if any) as a proximate cause.

█ Foreseeability of harm may be treated, alternatively, as one of the multiple factors giving rise to a duty of care; or as an element in the delineation of proximate cause. (See *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 739-742 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]; *Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295, 307-310 [29 Cal. Rptr. 33, 379 P.2d 513]; *Fuller* v. *Standard Stations, Inc.* (1967) 250 Cal.App.2d 687, 691-692 [58 Cal.Rptr. 792].) █ A defendant may be liable if his negligence is a substantial factor in causing the injury, and the presence of independent causal forces does not relieve him of liability if those forces were foreseeable. (*Stewart* v. *Cox* (1961) 55 Cal.2d 857, 863-864 [13 Cal.Rptr. 521, 362 P.2d 345]; *Fuller* v. *Standard Stations,*

*Inc., supra.*) ■ Except where there is no reasonable dispute over the issue, the foreseeability of harm arising from the defendant's conduct is a fact question for the jury. (*Richards* v. *Stanley* (1954) 43 Cal.2d 60, 66 [271 P.2d 23]; *Ishmael* v. *Millington* (1966) 241 Cal.App.2d 520, 525-526 [50 Cal.Rptr. 592]; Rest. 2d Torts, § 434.)

■ Whatever its place in legal doctrine, foreseeability of the Hell Hole Dam failure, that is, foreseeability of an unreasonable risk of harm to downstream property owners, was a jury question. Uncontroverted historical data, known to the contractor, established that at the 10-year flood stage the surface of the Rubicon River would rise to elevation 4,369; that in the flood of record (in the year 1955) the river's surface was at elevation 4,453.[4] This data stands in contrast with the construction stage demanded by the original specifications (elevation 4,470 for the main rock wall and 4,468 for the impervious core) and that actually achieved by the contractor (elevation 4,470 for the rock wall and only 4,300 for the core).

In weighing the issues of negligence and proximate cause, the jury was confronted with a set of interrelated space and time factors. These were the identical factors which had doubtless shaped the original contract demand for completion of the rockfill and core to designated heights as a prerequisite to blocking the river channel by November 15, 1964. That demand was premised upon the expectation of winter rains after the November 15th date. It provided the contractor with a parameter of achievement whose breach would cause peril varying in direct ratio to the volume and speed of rain-caused river flow. The historic hydrological data amply fortified the predictions of peril implied by the contract.

In arguing lack of foreseeability, ARC implies that the 1964 flood created a volume of water surpassing the prescience supplied by the historic data. Here, it points to evidence that the 1964 flood would have topped the partly constructed dam by 3½ feet, even had the rockfill and clay core attained the respective elevations of 4,470 and 4,468. Two engineers, Messrs. Mather and Brown, so testified. Accepting this evidence at face value, the jury was not required to pursue the unspoken inference now drawn by ARC, i.e., that the 1964 flood damage would have burst the dam had it been built to the originally specified heights. The engineering witnesses did not draw this inference. Both Mr. Mather and Mr. Brown opined that the dam would have held had ARC achieved the construction stage originally specified, because the over-topping flow would have dropped

---

[4]The 10-year flood was defined for the jury as "the kind or the size of the flood which could be expected at least once in every ten years." The record flood was defined as the "biggest" flood which had occurred prior to construction.

vertically from the permeable crest of the rockfill and emerged from the downstream toe of the dam without eroding it.

"The question is not whether defendant did foresee, or by the exercise of care should have foreseen, the identical consequence that happened. . . . The question is whether it was reasonably foreseeable that injury or damage would likely occur." (*Osborn* v. *City of Whittier* (1951) 103 Cal. App.2d 609, 616 [230 P.2d 132], quoted in 2 Witkin, Summary of Cal. Law (1960) p. 1489; see Rest. 2d Torts, § 435.) The undebated hydrological data provided substantial evidence to support the jury's inference that downstream flooding was a reasonably foreseeable peril, ensuing in part from the contractor's failure to bring the project to the expected stage of progress and in part from his decision to close the V-notch notwithstanding that failure.

 ARC next charges lack of evidence to support the damage award of $396,916. It contends that the maximum loss shown by the evidence was $182,241. The inquiry on appeal is whether the award was supported by substantial evidence, and the appellant has the burden of demonstrating error in the determination. (*City of Salinas* v. *Souza & McCue Construction Co.* (1967) 66 Cal.2d 217, 225 [57 Cal.Rptr. 337, 424 P.2d 921].)

 The evidence of damage was in conflict. Ralph S. Locke, president of Diamond Springs Lime Company, testified that the quarry and equipment had a market value of $600,000 in their preflood condition. After the flood plaintiff employed a general contractor to repair the plant. The contractor cleared the debris, rebuilt the washed-out road, reconstructed storage facilities and built a framework for the conveyor at a total cost of $204,175.94. Additionally, plaintiff spent $145,553.27 for replacing unsalvageable equipment. According to plaintiff's witnesses, plaintiff had on hand an inventory of limestone fines,[5] amounting to 27,400 tons and costing approximately $68,500 to produce. Plaintiff also produced evidence that the flood-caused interruption in its operations resulted in a loss of sales amounting to $148,918.62. Applying its average net profit rate of 10.82 percent to this volume of sales, plaintiff showed a loss of profit amounting to $16,113.

All this evidence was controverted. The defense showed that the cost of the plant and its depreciated value, as carried on plaintiff's books, amounted to much less than the claimed cost of reconstructing it. Defense evidence tended to show that plaintiff's inventory of fines consisted of beds of dirty limestone material underlying the quarry's work area and that this material

---

[5]"Fines" are a byproduct of rock crushing, less than three-fourths inch in size, which are saleable for road construction.

was not economically saleable. The average rate of net profit to apply to plaintiff's lost sales was disputed, as were the lost sales themselves. It is not the reviewing court's province to inquire into the relative weight of the conflicting evidence or to retry the damage question. ■ While there was some evidence of the preflood value of plaintiff's land, there was no evidence of its value in its damaged condition. In that state of the evidence, the court may not assume that the flood-caused dimunition of the value was less than the proved reasonable cost of necessary repairs. (*Pfingsten* v. *Westenhaver* (1952) 39 Cal.2d 12, 24 [244 P.2d 395].) ARC argues that plaintiff's repair and restoration expenditures resulted in a better and more efficient plant than it had before the accident—an argument to the jury, but not one recognizable on appeal. ■ Plaintiff's evidence of damage, summarized above, shows losses aggregating more than the award and provides substantial support for the award.

## Propriety of Jury Instructions

■ Error is assigned in the following jury instruction: "Proof that certain conduct was allowed, approved, or permitted by other persons, or by government regulating agencies, is not by itself proof of due care." The instruction represents a rule of law developed in a context alien to this case. It comes to the fore when negligence turns upon breach of a statute or public regulation. It declares, in effect, that one may conform with the terms of a governmental regulation, yet not exercise the care needed under the circumstances. (*Nevis* v. *Pacific Gas & Electric Co.* (1954) 43 Cal.2d 626, 630 [275 P.2d 761].)

Nevertheless, the instruction was not at all inappropriate and did not mislead the jury. There are many examples of the law's refusal to permit a negligent actor to escape liability by asserting the consent of a third party, public or private, to his dangerous conduct. A principal's consent to the tortious conduct of an agent does not exonerate the latter. (*Bayuk* v. *Edson* (1965) 236 Cal.App.2d 309, 320 [46 Cal.Rptr. 49].) An owner cannot escape liability for his property's dangerous condition by having a contractor assume the duty of repairing it; neither may the contractor pose the owner's consent as a shield against liability for his own negligence. (*Dow* v. *Holly Manufacturing Co., supra,* 49 Cal.2d at pp. 725-727.) In the context of the present case, the instruction did no more than restate the general principle that consent of a third party is no shield to a defendant's liability for the foreseeable consequences of his own dangerous conduct.

■ ARC charges error in a jury instruction appended in the margin.[6]

---

[6]The challenged instruction reads as follows: "A contractor on public work may be liable for injury resulting from the performance of public work either where he

It argues that inclusion of the phrase "without negligence" allowed the jury to find negligence despite ARC's compliance with the plans and specifications and its lack of knowledge of any inherent danger in these plans and specifications.

The instruction was almost a direct quotation from *Hamilton* v. *Harkins, supra,* 146 Cal.App.2d at pages 573-574. It was correct, both as an abstract proposition of law and as evoked by the evidence. At this point, as in the preceding claims of error, ARC fails to come to grips with the central issue in the case. The negligence issue did not turn on compliance with paper "plans and specifications." Rather, it pivoted on the contractor's care in conducting his work, on his timing, on his quantum of accomplishment when measured by risks which were foreseeable if he did not reach a particular stage by a particular time. The jury reasonably concluded that his accomplishments fell short, both in physical quantum and in time, thus creating an unreasonable risk of harm.

The court instructed the jury that plaintiff had the burden of proving by a preponderance of the evidence ARC's negligence and "the nature and extent of the damage which was proximately caused to the plaintiff." ▮ The court did not in so many words instruct that plaintiff had the burden of proving proximate cause. ARC correctly assigns this omission as error. The error was harmless because the instructions, taken as a whole, adequately informed the jury that proximate cause had to be proved.[7]

▮ The construction contract included a "hold harmless" provision requiring ARC to indemnify Water Agency for any injury or damage claim resulting from the work. ARC requested an instruction directing the

---

performs the work negligently, or where the plans and specifications prepared by the public agency are inherently dangerous and the contractor knows or should have known that this was so. But if the plans and specifications are inherently dangerous because of facts the contractor does not know and of which he is not chargeable, and the contractor performs the work pursuant to the plans and specifications *without negligence,* then the contractor is not liable." (Italics added.)

[7]Particularly significant at this point was an instruction declaring in part: "The law does not permit you to guess or speculate as to the cause of the accident in question. If the evidence is equally balanced on an issue, then your finding must be against the party making the charge on that issue. It is not enough merely to say that the accident would not have happened had it not been for what was done or what was not done by one of the parties. It may or may not be that the effect which ordinarily would have been expected to flow from certain conduct was changed by what we call an efficient intervening cause.

"Of course, the first question to be answered is whether other elements of liability have been proved. Proximate cause is one essential element to a finding of liability."

Another instruction declared: "The law does not permit you to guess or speculate as to the cause of the accident in question. If the evidence is equally balanced on the issue of negligence, or proximate cause, then your finding must be against the party making the charge on that issue."

jury to disregard any contract provisions with respect to the rights and liabilities of these two parties toward each other "or as to damages allegedly sustained by third parties." The trial judge modified this instruction by striking the quoted phrase, an action now assigned as error. The contention is grounded on the assumption that the modification influenced the jury's decision to return a verdict against ARC alone, rather than against both defendants jointly. We do not share the assumption. Other instructions fully apprised the jury that it could bring in a verdict against both defendants. The modified instruction informed the jury that the indemnification provision was not to be a factor in their decision. The instruction was complete without the phrase eliminated by the judge.

 ARC challenges a "conditional res ipsa loquitur" instruction on the theory that it did not have exclusive control over the work; rather, that control was shared with MKE, engineers for the project owner, and with the State Department of Water Resources.[8] ARC relies upon case law declarations that res ipsa loquitur is unavailable where the plaintiff does not sue all the parties who might have caused the injury. (See, e.g., *Poulsen* v. *Charlton* (1964) 224 Cal.App.2d 262, 268 [36 Cal.Rptr. 347].)

 In order to justify the conditional res ipsa loquitur instruction, a plaintiff need not demonstrate all the facts necessary to the res ipsa loquitur inference, but need only produce evidence sufficient to support findings that the requisite conditions are present. (*Keena* v. *Scales* (1964) 61 Cal.2d 779, 783 [40 Cal.Rptr. 65, 394 P.2d 809].) ARC's challenge to the instruction is but a variation of the argument that its construction delays were caused by the dilatoriness of MKE and the state in approving its proposed construction schedule. As pointed out earlier, the dispute as to the source and causes of the delayed progress presented a jury question. Moreover, under the contract, ARC had an unfettered election of .closing the V-notch or leaving it open. The authority of MKE to veto ARC's election to close the V-notch did not impair its freedom to elect to keep it open. (See fn. 2, *supra*.) Had it chosen to leave the V-notch open, neither

---

[8]The instruction declared: "One of the questions for you to decide in this case is whether the accident involved occurred under the following conditions:

"First, that it is the kind of accident which ordinarily does not occur in the absence of someone's negligence;

"Second, that it was caused by an agency or instrumentality in the exclusive control of defendant American River Constructors and its constituent joint venturers; and

"Third, that the accident was not due to any voluntary action or contribution on the part of the plaintiff.

"If, and only in the event that you should find all these conditions to exist, you are instructed as follows: . . ."

Following the above instruction, the court gave the standard instruction on the res ipsa loquitur inference.

MKE nor the state could have vetoed the latter choice. There was substantial evidence to support findings of ARC's exclusive control over the accident-producing factors, and this evidence justified the conditional res ipsa loquitur instruction.

### Evidentiary and Procedural Rulings During Trial

 ARC charges prejudicial misconduct when, in the course of jury qualification, plaintiff's counsel asked several prospective jurors if they would follow an instruction of law imposing "absolute liability" on ARC.[9] Although ARC's counsel initially objected to this questioning, he did not object when the court instructed plaintiff's counsel to revise the form of the question and it was put to the panelists in revised form. Since there was no assignment of misconduct or a request for admonition, the charge of misconduct will not be considered on appeal. (*Sabella* v. *Southern Pac. Co.* (1969) 70 Cal.2d 311, 318 [74 Cal.Rptr. 534, 449 P.2d 750].)

 Next ARC challenges a trial court order requiring it to present its defense before Water Agency proceeded. The order was made in response to Water Agency's motion. The motion was supported by plaintiff. When several defendants, each having separate defenses, appear by separate counsel, the court must determine their relative order of presentation. (Code Civ. Proc., § 607, subd. 8; see also Evid. Code, § 320.) The reviewing court will uphold such a determination unless abuse of discretion is clear and a miscarriage of justice has resulted. (*Silver* v. *Shemanski* (1949) 89 Cal.App.2d 520, 529 [201 P.2d 418].) ARC charges abuse of discretion, arguing that the order "sandwiched" it between two hostile parties and enabled Water Agency's counsel to select some witnesses for attack and others for toleration.

One codefendant in a tort case may legitimately attempt to shift liability to another. (See Supreme Court's order denying hearing in *Goehring* v. *Rogers* (1924) 67 Cal.App. 260, 262-263 [277 P. 687].) While the order of presentation doubtless presented Water Agency's counsel with tactical opportunities, similar opportunities would have been available under any circumstances. The trial court had the task of promoting maximum jury comprehension amid a welter of complex and frequently technical evidence. In granting the order the judge stated that the jury would "better receive the case" if ARC proceeded before Water Agency. At the time, the judge

---

[9] Although counsel use the phrase "absolute liability," the discussion actually centers around the strict liability doctrine of *Fletcher* v. *Rylands,* 3 H.L. 330. At the time of *voir dire,* this theory of recovery was among the issues listed in the pretrial conference order. Later, during trial, plaintiff withdrew this theory from the case. (See *Clark* v. *Di Prima* (1966) 241 Cal.App.2d 823 [51 Cal.Rptr. 49].) The court did not instruct the jury on this theory of liability.

could not predict that the jury would eventually exonerate Water Agency. His point of view was prospective only. In prospect, he was put to the necessity of predicting which issues would dominate the trial and which might blur the dominant issues. He had before him the enumeration of issues made by the pretrial conference order. That order posed several theories on which Water Agency might be liable, such as inverse condemnation and the dangerous condition of public property. It posed negligence and strict liability (under the *Fletcher* v. *Rylands* doctrine) as bases of ARC's liability.

In prospect, the trial judge was justified in regarding ARC's negligence as the dominant issue in the case, whose resolution by the jury might in turn guide its verdict on the other issues. Clarity of jury understanding would be promoted by an order of trial posing a head-on clash between inculpation and exculpation of the contractor. To force Water Agency to intrude its own vindication into this clash would blur the battle lines. The ruling was completely within the range of discretionary authority.

■ The trial court excluded two documentary exhibits offered by ARC, primarily on the ground of hearsay. One was an August 1964 report to MKE by J. Barry Cooke, its engineering consultant, expressing the view that completion of the rockfill to elevation 4,470 and of the core to 4,300 or 4,350 would be safe. The other consisted of an ARC employee's notes of an August 1964 meeting in which another MKE engineer (James Growden) requested ARC to close the river "with whatever it takes" before the 1963-1964 winter rains. ARC argues that these statements were not offered to prove their truth; that statements of third persons providing the basis upon which ARC acted were admissible as evidence of the reasonableness of its action. (Witkin, Cal. Evid. (2d ed. 1966) p. 432.)

We refrain from passing on the question of intrinsic admissibility. Mr. Cooke testified in person and described the opinion he had held in August 1964. Another witness testified to the oral opinion Mr. Growden had expressed in 1964. The two documents were cumulative of other evidence, merely restating matters fully described to the jury. Their exclusion did not prejudice ARC's case.

Engineering witnesses were in conflict over the question whether the dam as originally specified (with the rock wall at elevation 4,470 and the core at 4,468) would have withstood the flood pressure. A witness for plaintiff (Mr. Mather) testified that the dam would have held, for its 60-foot crest, although quasi-impervious, was sufficiently permeable to let water penetrate downward through the top of the rockfill and travel vertically through its interior, emerging at the downstream toe. ARC called two experts (Messrs. Cooke and Leps), who stated that the crest of the rock wall was impervious

and that water flowing over the crest would erode the rock wall, causing the dam to fail. ▮ After ARC had rested, Water Agency called two experts (Messrs. Schulz and Hill), who testified that even if the crest were impervious, the dam would have held. ARC requested leave to reopen its case for the purpose of presenting engineering opinion to rebut that of Messrs. Schulz and Hill. The trial court's rejection of this request is now assigned as an abuse of discretion.

ARC argues that Schulz and Hill's testimony brought out a new theory which it was entitled to rebut by additional proof. The "new theory" claim is not tenable. Actually, Mr. Brown, an engineer called by ARC itself, had given testimony similar to that of Schulz and Hill. The testimony of the latter two engineers controverted that of several ARC witnesses but did not raise a new theory. The ruling was within the trial court's discretionary authority over the scope of rebuttal. (*Ray* v. *Jackson* (1963) 219 Cal. App.2d 445, 454 [33 Cal.Rptr. 339].)

▮ Outside the jury's presence the court directed ARC's counsel not to argue to the jury regarding two contracts in evidence, one, a 1958 contract which made MKE responsible to Water Agency for the conduct of hydrological studies, the other a 1962 contract making MKE the representative of Water Agency for construction supervision. ARC contends that these contracts had been admitted into evidence without restriction and were therefore available as bases for jury argument. It argues that the court's ruling prevented it from showing its reasonable reliance on MKE's hydrological studies and from arguing MKE's control (and ARC's own lack of exclusive control) over the accident-producing factors.

At this point of its argument ARC returns to a persistently repetitious theme, rejected at several other points of this opinion, a theme which characterizes it as the helpless tool of other agencies, not in real control of the project and responsible neither for delays nor decisions. Earlier, we pointed to substantial evidence that inefficiency and dilatoriness on the part of ARC—achieved without assistance from any other source—retarded the project. Earlier, we pointed out that ARC's decision to close the V-notch was its own decision, not imposed upon it by any other agency. (See fn. 2, *supra,* and accompanying text.) That these collateral contracts, to which it was not a party, deprived ARC of control over the accident-producing factors, was an argument designed to inveigle the jury into a blind alley. The court's ruling was designed to close this blind alley and hold the jury to the real issues. The ruling was eminently correct.

▮ ARC charges misconduct of plaintiff's counsel in closing argument because of several references to matters outside the record. Although

these references were not completely devoid of evidentiary support, the trial court sustained a defense objection on each occasion. This court will not review the claim of misconduct because in neither instance did ARC's counsel request that the jury be admonished to disregard the statement. (*Sabella* v. *Southern Pac. Co., supra.*)

### Quotient Verdict

 On ARC's motion for a new trial it presented affidavits of five jurors, all to the effect that the jury had resorted to a quotient verdict in order to fix the amount of the award. Contending that the verdict was the result of chance, ARC charges error in the denial of its new trial motion.

Misconduct ensues and a new trial is justified whenever jurors' affidavits reveal that one or several jurors have been induced to assent to a verdict "by a resort to the determination of chance. . . ." (Code Civ. Proc., § 657, subd. 2.) A damage award achieved by averaging the amount specified by each of the jurors is a quotient verdict. " 'A quotient verdict does not necessarily constitute a chance verdict, provided the average sum which is thus procured is not adopted without subsequent consideration or balloting by the jurors. If, after a quotient figure is obtained, the jurors discuss and ballot upon the adoption or rejection of that sum, it is conclusive evidence they were not bound by a previous agreement to accept it without further consideration.' " (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 795 [91 Cal.Rptr. 760, 478 P.2d 480], quoting from *Balkwill* v. *City of Stockton* (1942) 50 Cal.App.2d 661, 671 [123 P.2d 596].)

 The five affidavits presented by ARC all stated that the jurors had agreed in advance to be bound by a damage figure obtained by averaging the amounts which the individual jurors would inscribe on paper. Counsel for plaintiff presented counteraffidavits of six jurors, three of whom were among the five who had furnished affidavits to ARC. In all six of the counteraffidavits, the jurors declared that there had been no advance agreement to abide by the averaged amount; that in fact the averaged amount was discussed by the jurors after it had been calculated; that some jurors thought it too high, others too low; that eventually nine or more jurors agreed that the figure was fair and reasonable.

The affidavits were squarely in conflict. The trial court's denial of the new trial motion amounted to a determination of the controverted facts. In effect, the trial court found that the jurors had not agreed in advance to be bound by the quotient amount. An appellate court will not disturb the finding of a trial court against a chance verdict when that finding is based upon conflicting affidavits. (*Monroe* v. *Lashus* (1959) 170 Cal.App.2d 1, 6-7 [338 P.2d 13].)

*Status of Judgment Exonerating Placer*
*County Water Agency*

We turn to the cross-appeal of plaintiff Diamond Springs Lime Company from that phase of the judgment exonerating Water Agency. On the assumption that the judgment against ARC is fully collectible, plaintiff's cross-appeal appears to be taken for protective purposes only. Quite aside from that supposition, plaintiff created a trial record which has effectually destroyed its cross-appeal.

At the very close of jury argument, plaintiff's trial counsel addressed the following argument and request to the jury: ". . . I still want to come back to the original thing that I maintain, I don't believe the people over in Auburn or Placer County should be penalized because of this, and that is why I have worked with the people from Placer County. To make them pay for something that was done solely and exclusively by this big Joint Venture is absolutely unfair. . . . Now, I am going to ask you to bring in a verdict for the amount I have just put on the board, solely and exclusively against A.R.C., . . ."

By requesting a jury verdict "exclusively" against ARC, plaintiff's trial counsel impliedly but distinctly invited a verdict exonerating Water Agency. Upon the heels of this argument, the trial court instructed the jury. Oblivious of plaintiff's invitation to exonerate Water Agency, the instructions submitted the question of Water Agency's liability on two theories: first, recovery for damage proximately caused by the dangerous condition of public property; second, inverse condemnation under the eminent domain provision of the California Constitution. As we know, the jury returned the verdict which plaintiff's counsel had invited. Now, in support of its cross-appeal, plaintiff argues that as a matter of law Water Agency was liable to it on two theories: one, inverse condemnation,[10] two, breach of a nondelegable duty. The latter is a new theory raised for the first time on appeal.

Plaintiff blows hot and cold with the judicial process, inviting the jury to exonerate an adversary, then urging an appellate court to nullify the verdict it invited. Generally, a party who invites error is estopped from using it as ground for reversal on appeal. (*Lynch* v. *Birdwell* (1955) 44 Cal.2d 839, 846 [285 P.2d 919]; *Bondulich* v. *O. E. Anderson Co.* (1962) 210 Cal.App.2d 12, 17 [26 Cal.Rptr. 147].) In a nonjury case, an appellant will not be permitted to challenge a finding made at his own request. (*Snow*

---

[10]See *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296 [90 Cal.Rptr. 345, 475 P.2d 441]; *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129].

*Mountain W. & P. Co.* v. *Kraner* (1923) 191 Cal. 312, 325 [216 P. 589].) No California case considers whether the invited error rule extends to an invited jury verdict. (See, however, *Brown* v. *Regan* (1938) 10 Cal.2d 519, 523-524 [75 P.2d 1063].)

A cognate approach, applicable here, is that of waiver. Through counsel, plaintiff impliedly assured the jury that it would not object to a verdict exonerating Water Agency. Its appeal violates that assurance. Did that assurance, then, amount to a waiver of appeal from a judgment based upon the invited verdict?

A waiver is generally defined as the intentional relinquishment of a known right. As he stood before the jury, plaintiff's trial counsel had complete charge of his client's case, subject to the limitation that he could not impair, compromise or destroy the client's cause of action without the latter's consent. (*Linsk* v. *Linsk* (1969) 70 Cal.2d 272, 276-278 [74 Cal. Rptr. 544, 449 P.2d 760].) Palpable case law has it that an attorney's procedural authority includes the implied authority to waive his client's right of appeal. (*Fowlkes* v. *Ingraham* (1947) 81 Cal.App.2d 745, 747-748 [185 P.2d 379]; see *Estate of Hart* (1962) 204 Cal.App.2d 634, 637 [22 Cal.Rptr. 495].) That case law has been criticized. (See *Linsk* v. *Linsk, supra,* 70 Cal.2d at p. 278; *Wuest* v. *Wuest* (1942) 53 Cal.App.2d 339, 345 [127 P.2d 934]; 1 Witkin, Cal. Procedure (2d ed. 1970) p. 132.)

Many of the decisions dealing with an attorney's authority over the litigation involve questionable stipulations. Here, in contrast, the attorney indulged in a discretionary tactical maneuver (one whose legitimacy we do not question). The maneuver was deliberately conceived as an aid to his client's interests, sacrificing potential recovery from one adversary to fortify potential recovery from the other. The attorney was employing his best discretion toward the achievement of his client's fundamental goals. The situation and the tactic respond to a declaration of the state Supreme Court: "If counsel merely employs his best discretion in protecting the client's rights and achieving the client's fundamental goals, his authority to proceed in any appropriate manner has been unquestioned. On the other hand, if counsel abdicates a substantial right of the client contrary to express instructions, he exceeds his authority." (*Linsk* v. *Linsk, supra,* 70 Cal.2d at p. 278.)

By the criterion of the quoted pronouncement, the attorney did not exceed his authority.

Judicial policy reinforces the invocation of waiver. California trial and appellate courts are coping with an avalanche of litigation. The trial of this case occupied 31 court days, spread over almost two months. Its review

has required extended appellate consideration. The taxpayers have spent substantial money on judicial facilities for this lawsuit. In the interest of conserving judicial facilities for consistently pursued litigation, plaintiff should be held to the deliberate concession made in the trial court. The sensibilities of appellate judges are strained by the prospect of reversal to allow resumption of a chase the party deliberately abandoned in open court. Courts and juries are not jumping jacks, somersaulted in one direction or another by a litigant's strategy.

We conclude that plaintiff's request for a verdict against one defendant alone was an effective waiver of its right to appeal from the verdict exonerating the other defendant. We do not reach the merits of plaintiff's cross-appeal. The cross-appeal will be dismissed.

At this point we return to the appeal of ARC. ARC's notice of appeal described an appeal from "the judgment" without designating that phase awarding damages to plaintiff or that phase exonerating Water Agency. A single document embodied both phases of the judgment. In view of the prevailing rule of liberal construction, the notice is an adequate foundation for an appeal from both phases of the judgment. (Rule 1, Cal. Rules of Court; see *Kellett* v. *Marvel* (1936) 6 Cal.2d 464, 472-473 [58 P.2d 649].) ARC's opening brief was devoted entirely to assignments of error affecting the judgment won by plaintiff. In its closing brief, not earlier, ARC seeks reversal of that phase of the judgment exonerating Water Agency, contending that as a matter of law Water Agency became liable to plaintiff for inverse condemnation damages.

There are three reasons why we reject ARC's plea for reversal of the judgment won by its codefendant: First, established case law has it that a defendant having independent liability has no standing to appeal from a judgment exonerating his codefendant, even where a potential right of contribution exists. (*Cook* v. *Superior Court* (1969) 274 Cal.App.2d 675, 679 [79 Cal.Rptr. 285]; *Guy F. Atkinson Co.* v. *Consani* (1963) 223 Cal.App.2d 342 [35 Cal.Rptr. 750], hg. den.)

Second: Possibly ARC is an aggrieved party with standing to appeal because it expressly agreed to indemnify its codefendant from loss or damage. The judgment in this suit may collaterally estop it from resisting a claim for its codefendant's litigation expenses. Despite this possibility of standing to appeal, ARC has not chosen to bolster its inverse condemnation theory with argument or citation of authority. The question of standing has been ignored. A point suggested by appellant's counsel without supporting argument or authority may be rejected by the reviewing court without discussion. (*Dahl-Beck Electric Co.* v. *Rogge* (1969) 275 Cal.App.2d 893, 902 [80 Cal.Rptr. 440].)

 Third: The inverse condemnation contention is omitted from ARC's opening brief and made only in its reply brief. A contention made for the first time in an appellant's reply brief, unaccompanied by any reason for omission from the opening brief, may be disregarded. (*Crowder v. Lyle* (1964) 225 Cal.App.2d 439, 450 [37 Cal.Rptr. 343].)

These combined factors foreclose inquiry into the merits of ARC's plea for reversal of the judgment exonerating Water Agency.

The cross-appeal of Diamond Springs Lime Company is dismissed. The judgment is affirmed.

Regan, J., and Janes, J., concurred.

A petition for a rehearing was denied May 4, 1971, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied June 3, 1971.