(S. F. No. 21914. In Bank. Feb. 24, 1967.]

RUSSIAN HILL IMPROVEMENT ASSOCIATION et al., Plaintiffs and Respondents, v. BOARD OF PERMIT APPEALS OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Appellants.

Thomas M. O'Connor, City Attorney, Robert A. Kenealey, Deputy City Attorney, Pillsbury, Madison & Sutro, John B. Bates, Noble K. Gregory and Thomas E. Feeney for Defendants and Appellants.

Heller, Ehrman, White & McAuliffe, Caspar W. Weinberger and M. Laurence Popofsky for Plaintiffs and Respondents.

TOBRINER, J.—The present controversy involves an attempt by the Board of Permit Appeals to authorize the construction of a building which would rise to over twice the maximum height permitted by the governing ordinances of the City and County of San Francisco.

The trial court granted a writ of mandate directing the board to revoke a permit purporting to authorize such con-

struction. Defendants appeal, contending that the permit in question was "lawfully granted" within the meaning of section 150 of the City Planning Code of San Francisco[1] in time to immunize the proposed project from the operation of a newly enacted height limitation.[2] ■ Since the permit application was still pending before the Board of Permit Appeals when the new height limitation became effective, we hold that the permit was not "lawfully granted" in time to confer immunity under section 150, and that the trial court properly ordered the permit revoked.

I

Beginning in 1961, a number of public and private agencies investigated possible height limitations for the northern portion of San Francisco. After holding public hearings in late 1963 and early 1964, the City Planning Commission and the Public Buildings, Lands and City Planning Committee of the Board of Supervisors approved enactment of an ordinance to establish a maximum legal height of 105 feet for buildings constructed in the area involved in this litigation.

On January 22, 1964, HAP Development Company, HAP Development Partnership, and Haas & Haynie Corporation (hereinafter collectively referred to as "the developers") filed with the Central Permit Bureau (hereinafter referred to as "the permit bureau") an application for a site permit, seeking permission to construct a 235-foot-high apartment building at the corner of Polk and Greenwich Streets in San Francisco. On February 10, while the permit bureau was still considering the developers' application, the Board of Supervisors enacted the ordinance recommended by the City Planning Commission and by the Public Buildings, Lands and City Planning Committee. By its terms, the height ordinance was to take effect on March 23, 1964. Since the structure

---

[1]Section 150, subdivision (d) provides: "Any building or use for which a permit has been lawfully granted prior to the effective date of an amendment to the City Planning Code, where such date is subsequent to May 2, 1960, may be completed and used in accordance with the approved plans, provided that construction is started and diligently prosecuted to completion in accordance with Section 304 of the Building Code, and such building or use shall thereafter be deemed to be a lawfully existing building or use." (Amended Ord. 200-60, approved April 21, 1960.)

[2]Special Height District Ordinance No. 35-64 limits the maximum legal height for structures on the property in question to 105 feet. (See City Planning Code, §§ 214, 250, 280-283.) The structure proposed here would rise 130 feet above that maximum.

which the developers proposed would rise far above the maximum height permitted at that location by the newly-enacted ordinance, the Director of City Planning recommended that the developers' application be denied. Notwithstanding that recommendation, the City Planning Commission voted on March 12 to approve the application.

On March 19, just four days before the effective date of the new height limitation and several weeks after its endorsement by the mayor,[3] the permit bureau entered an order which approved the developers' application and transmitted to them a document described on its face as a "permit issued subject to appeal within 10 days to Board of Permit Appeals." The document admonished the developers to incur no expense until the right of appeal had lapsed.

Plaintiff Russian Hill Improvement Association (hereinafter referred to as "the association") filed a timely but unsuccessful appeal to the Board of Permit Appeals protesting the permit bureau's order; on May 4 the board denied the association's application for a rehearing.[4] On the association's petition, the superior court ordered the developers' site permit revoked.

Defendants contest the order of revocation on the theory that the Board of Permit Appeals acted properly in testing the permit application under the law which was in effect when the permit bureau approved that application on March 19. Plaintiffs concede that no law then operative rendered the bureau's action unlawful.[5] By the time the matter had reached the Board of Permit Appeals, however, the governing law clearly prohibited the structure described in the developers' application. ■ Since the permit bureau had made no

[3] Ordinance No. 35-64 was signed by the Mayor of San Francisco on February 21.

[4] The association appealed on March 25; on April 20 the Board of Permit Appeals concurred in the permit bureau's March 19 order. The association applied for a rehearing on April 28; on May 4 the board denied that application by a vote of three to two.

[5] Even on March 19, however, the permit bureau could properly have exercised its *discretion* to deny the permit application on the ground that the structure described therein would soon be rendered illegal by the pending ordinance. (*Brougher* v. *Board of Public Works* (1928) 205 Cal. 426 [271 P. 487]; *Charles L. Harney, Inc.* v. *Board of Permit Appeals* (1961) 195 Cal.App.2d 442, 446-447 [15 Cal.Rptr. 870].) The case before us is manifestly *not* one in which "the enactment of the ordinance stemmed from [any] attempt to frustrate [the developers'] plans." (*Sunset View Cemetery Assn.* v. *Kraintz* (1961) 196 Cal.App.2d 115, 123-124 [16 Cal.Rptr. 317]; see also *Munns* v. *Stenman* (1957) 152 Cal.

record of the reasons underlying its March 19 order,[6] and since that order had been suspended by operation of law,[7] the entire controversy necessarily came before the Board of Permit Appeals *de novo*. Accordingly, the question facing the board was whether the permit should be granted, not whether the suspended order of the permit bureau had been lawful.

 Since *de novo* review by the Board of Permit Appeals is an integral part of the entire permit procedure,[8] the board, as an agency entrusted with broadly discretionary power, would ordinarily be bound to apply the zoning ordinances in force at the time of the *final* administrative decision, rather than the ordinances in effect at the time of preliminary proceedings before the permit bureau.[9]

 Defendants contend only that section 150, by immunizing outstanding permits from subsequent changes in the zoning ordinances, created an exception to this uniformly recognized principle of administrative law. As defendants interpret the section, it clothes a permit with statutory immunity the moment such a permit is *issued* by a lawful order of the permit bureau, notwithstanding any change in the governing law pending *de novo* review of the permit application by the

---

App.2d 543 [314 P.2d 67].) On the contrary, the public hearings and official recommendations which preceded the enactment of the new ordinance and the filing of the permit application placed the developers ''fully on notice that the City was proceeding to exercise [the] power which ultimately [resulted] in the adoption of the ordinance . . . .'' (*Sharrow* v. *City of Dania* (Fla. 1955) 83 So.2d 274, 275-276; see Note, (1958) *Building Permits—Effect of Pending or Subsequently Proposed and Enacted Legislation on Applications for Building Permits*, 34 Notre Dame Law. 109, 112.)

[6]As we noted in *Lindell Co.* v. *Board of Permit Appeals* (1943) 23 Cal.2d 303, 314 [144 P.2d 4], neither the San Francisco Charter nor the San Francisco Municipal Code provides for findings of fact or law by the permit bureau.

[7]''Pending decision by the Board of Permit Appeals, the action from which an appeal is taken . . . shall be suspended.'' (Municipal Code, pt. III, art. 1, § 8.)

[8]See *City & County of San Francisco* v. *Superior Court* (1959) 53 Cal.2d 236, 248-249 [1 Cal.Rptr. 158, 347 P.2d 294]; *Lindell Co.* v. *Board of Permit Appeals, supra,* 23 Cal.2d 303, 313-315. Contrast the more narrowly confined role of the Board of Permit Appeals in the variance area. (See *Cow Hollow Improvement Club* v. *Board of Permit Appeals* (1966) 245 Cal.App.2d 160, 169-171 [53 Cal.Rptr. 610].)

[9]Defendants concede that, as a general rule, ''a change of law pending an administrative hearing must be followed in relation to permits for future acts. Otherwise the administrative body would issue orders contrary to the existing legislation.'' (*Ziffrin, Inc.* v. *United States* (1943) 318 U.S. 73, 78 [87 L.Ed. 621, 63 S.Ct. 465]; see also *Fassilis* v. *Esperdy* (2d Cir. 1962) 301 F.2d 429, 432.)

Board of Permit Appeals.[10] We have concluded, however, that section 150 requires no such departure from traditional principles of administrative law since that section contemplates only the protection of those permits which have attained finality in the administrative process.[11]

## II

Prior to the enactment of section 150, even a permit which had achieved administrative finality could be revoked on the basis of a subsequent change in the zoning laws.[12] The permittee could win immunity from such "ex post facto" revocation only by constructing a substantial portion of the structure authorized by his permit in good faith reliance upon the prior law.[13] A permittee who delayed construction in the face of an impending amendment to the zoning laws might find that he had not progressed far enough in time to qualify for immunity;[14] one who proceeded with unseemly haste ran the risk that his conduct might bear the stigma of bad faith.[15] No facile formula informed the permittee how to strike the delicate balance which would afford the desired immunity.

---

[10]As defendants read section 150, the immunity which it provides prior to administrative finality is merely conditional; defendants urge only that the section *authorized* the Board of Permit Appeals to ignore the 105-foot height limitation, not that it *required* the board to do so. (See fn. 18, *infra.*)

[11]A permit achieves such finality only when the right to invoke the discretionary reviewing authority of the Board of Permit Appeals has been exhausted. Thus a permit issued by the permit bureau becomes final at the conclusion of the 10-day period following the order which issued that permit, if such order has not been appealed by that time. Otherwise, the permit becomes final only at the conclusion of the 40-day period following the filing of a timely appeal. (Municipal Code, pt. III, art. I, §§ 8, 14; *Lindell Co.* v. *Board of Permit Appeals, supra,* 23 Cal. 2d 303, 323.)

[12]See *Brougher* v. *Board of Public Works, supra,* 205 Cal. 426, 432-435; *Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479]; 58 Am.Jur., Zoning, § 185; 101 C.J.S., Zoning, § 243; Comment (1963) "*Ex Post Facto*" *Zoning,* 31 Ford.L.Rev. 545.

[13]See *County of San Diego* v. *McClurken* (1951) 37 Cal.2d 683, 691 [234 P.2d 972]; see also *Trans-Oceanic Oil Corp.* v. *Santa Barbara* (1948) 85 Cal.App.2d 776, 784-788 [194 P.2d 148], and cases there cited.

[14]See McQuillin, 8 Municipal Corporations (3d ed. 1965) §§ 25.157, 25.158; 101 C.J.S., Zoning, § 244; Note, *The Administration of Zoning Flexibility Devices: An Explanation for Recent Judicial Frustration* (1965) 49 Minn.L.Rev. 973, 987-990; Note, *op. cit. supra,* 34 Notre Dame Law. 109, 117.

[15]See *Penn Township* v. *Yecko Bros.* (1966) 420 Pa. 386 [217 A.2d 171]; see also *Stowe* v. *Burke* (1961) 255 N.C. 527, 534-536 [122 S.E.2d 374], and cases there cited; cf. *Trans-Oceanic Oil Corp.* v. *City of Santa Barbara, supra,* 85 Cal.App.2d 776, 784, 786.

 To eliminate the uncertainty and waste inherent in these rules, a number of municipalities enacted ordinances which predicated immunity from permit revocation upon some clearly defined action of a municipal agency.[16] Under section 150, that action was the "lawful granting" of a permit.

Nothing in the history of section 150 lends the slightest support to the suggestion that it was designed to protect the mere *hope* that a pending permit application would ultimately receive final approval. We have long held that one who is not yet armed with a presently effective municipal license to proceed with construction must assume the risk that, "before final action [has] been taken on [his] application" (*Brougher* v. *Board of Public Works, supra,* 205 Cal. 426, 435), the law might be changed so as to require that his application be denied. (See, e.g., *Anderson* v. *City Council* (1964) 229 Cal. App.2d 79, 88-90 [40 Cal.Rptr. 41]; *O'Rourke* v. *Teeters* (1944) 63 Cal.App.2d 349, 352 [146 P.2d 983].) Defendants have suggested no reason, historical or otherwise, to suppose that section 150 contemplated a departure from this established rule.

As counsel for the developers acknowledged in oral argument before this court, the central purpose of section 150 is to set a definite date as of which a permittee's rights may be ascertained with certainty. Thus, once a permit has been "lawfully granted" within the meaning of section 150, that section automatically empowers the permittee to complete the approved structure subject only to a requirement of diligent performance.[17] To constitute the "lawful granting" of a permit, an action must therefore confer a fixed right, not subject to divestment pursuant to future legislation. Yet the action of the permit bureau in issuing a permit *cannot* in itself

[16]See 58 Am.Jur., Zoning, § 186. In some states, the matter has been governed by statute. One such statute (Mass. Gen. Laws, ch. 40A, § 11 (1954)) immunizes a permit from revocation by a subsequent zoning amendment only if the permit in question was issued before the permittee acquired notice of the proposed amendment. The developers in the instant case could not, of course, have met any such requirement. (See fn. 5, *supra.*)

[17]Section 150, subdivision (d), protects only permittees who render timely performance in accordance with section 304 of the Building Code, which in turn computes timeliness "from the date of the final action of the Board of Permit Appeals," the date on which the permittee is effectively entitled to proceed with construction. The fact that the protection of the statute is thus made to hinge upon "final action" by the board lends further support to our conclusion that it was never meant to afford a statutory shield to developers whose permits had not achieved administrative finality prior to the effective date of a zoning amendment.

confer such a right. Even after a permit has been lawfully issued by the bureau, the Board of Permit Appeals necessarily retains discretionary power to order that the permit be denied because of a pending change in the law.[18] At most, therefore, the lawful *issuance* of a permit by the bureau can confer a *conditional* immunity, hardly the kind of shield contemplated by a statute designed to fix the rights of a permittee upon a certain date.

If we were to construe the statute to afford this sort of partial protection for permit applicants in addition to the total protection which it undeniably provides to permits which have become final, we would achieve nothing germane to the purposes of section 150. Such a construction would simply arm the Board of Permit Appeals with discretionary authority to ignore laws which become effective during the pendency of a permit application. The addition of this option to the already broad arsenal of discretionary weapons available to the board would only compound the uncertainty of all interested parties, a result which would subvert rather than subserve the legislative purpose.

### III

Without seriously disputing this analysis, defendants advance two independent arguments in support of their interpretation of the section. They suggest first that, unless we adopt their view, we shall encourage repeated petitions for rehearing before the Board of Permit Appeals by those who wish to postpone the granting of a permit until a new ordinance has become operative. This argument relies upon defendants' unsupported assertion that the Board of Permit Appeals is empowered to grant rehearings without limitation as

[18]A contrary conclusion would abrogate the right of all interested parties, secured by section 39 of the San Francisco Charter and by the Municipal Code, part III, article 1, sections 14 and 30, to urge in formal hearings before the Board of Permit Appeals the *impropriety* of issuing a permit in conflict with an imminent zoning change, notwithstanding the *lawfulness* of issuing such a permit before the effective date of that change. (See fn. 5, *supra*.)

Any interpretation of section 150 which would defeat this statutory right to invoke the discretionary authority of the Board of Permit Appeals would be clearly unacceptable in light of the fact that the Central Permit Bureau, unlike the board, is not obliged to accord opposing parties any rights whatever. (Cf. fn. 6, *supra*.) Accordingly, defendants construe the section so as to preserve the discretionary jurisdiction of the Board of Permit Appeals in this area. (See fn. 10, *supra*.)

to time.[19] In point of fact, the Board of Permit Appeals possesses no such authority. Sections 8 and 14 of part III, article 1, of the Municipal Code both provide that the Board of Permit Appeals must enter its final order not later than 40 days after the filing with it of the first appeal.

Defendants secondly suggest that the words "issue" and "grant" are synonymous. They insist that those words are used interchangeably in the San Francisco Charter and Municipal Code, and they conclude that, as a linguistic matter, section 150 should be read to protect permits as soon as they have been lawfully "issued" by the permit bureau.[20] In approaching this argument, we recall the admonition of Learned Hand: "[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary. . . ." (*Cabell* v. *Markham* (2d Cir. 1945) 148 F.2d 737, 739, affd. *sub nom. Markham* v. *Cabell* (1945) 326 U.S. 404 [90 L.Ed. 165, 66 S.Ct. 193].)

Even on its own rigidly formalistic level, however, defendants' position proves to be untenable. ▆▆ Contrary to defendants' assertions, the relevant portions of the San Francisco Charter and the Municipal Code do *not* use the words "issue" and "grant" interchangeably; instead, they employ the "issuance" concept to describe the *initial departmental action* which is reviewed by the Board of Permit Appeals, but reserve the "granting" concept for the *final disposition* of

[19] Defendants have evidently misread *Lindell Co.* v. *Board of Permit Appeals, supra,* 23 Cal.2d 303. Contrary to defendants' assertion, we did *not* say in *Lindell* that the Board of Permit Appeals could grant rehearings "without limitation as to time"; we said only that such rehearings could be granted "without limitation as to the *grounds* thereof." (23 Cal.2d at 319.) (Italics added.)

[20] Although courts in other jurisdictions have had occasion to interpret immunity provisions analogous to that of section 150 (see, e.g., *City of New Britain* v. *Kilbourne* (1929) 109 Conn. 422 [147 A. 124]; *City of Shreveport* v. *Dickason* (1926) 160 La. 563 [107 So. 427]; *Alexander* v. *Building Inspector of Provincetown* (1966) 350 Mass. 370 [214 N.E. 2d 876]; *Fleming* v. *Moore Bros. Realty Co., Inc.* (1952) 363 Mo. 305 [251 S.W.2d 8]; *Rathkopf* v. *Remsen Street Co.* (N.Y.Sup.Ct. 1963) 18 App.Div.2d 923 [238 N.Y.S.2d 336]; *In re W. P. Rose Builders Supply Co.* (1932) 202 N.C. 496 [163 S.E. 462]; *Hauser* v. *State* (1925) 113 Ohio 662 [150 N.E. 42]), none of these cases involved the question of whether a validly *issued* permit should be regarded as "lawfully granted" before it has attained administrative finality. We note, however, that one court, when construing an ordinance which protected permits "lawfully and *finally* issued," spoke of the act required by the ordinance as the "*granting* of the permit." (*City of New Britain* v. *Kilbourne, supra,* 109 Conn. 422, 424-425.) (Italics added.)

the matter pursuant to the board's orders.[21]

Defendants correctly note that the Board of Permit Appeals cannot *itself* "grant" a permit but can only direct the permit bureau to do so. They add, quite properly, that if the order of the permit bureau were not appealed, that action rather than any action taken by the Board of Permit Appeals would constitute the final decision relative to the granting or denial of the permit in question. Although this observation might be of some interest if we were concerned with the question of *which agency* may grant a permit, it casts no light upon the problem presented by the case before us, since we are here concerned not with *who* granted the permit but with *when* it was granted. On that issue, the statutory language is inconclusive; it strongly suggests, however, that a permit has not been "lawfully granted" within the meaning of section 150 until the jurisdiction of the Board of Permit Appeals has been exhausted.[22]

IV

Finally, by holding that a permit is not "lawfully granted" until all administrative action with respect to the permit application has been completed, we preserve municipal power to prevent the circumvention of newly enacted zoning laws. "Given the objective of zoning to eliminate nonconforming uses, courts throughout the country generally follow a strict

---

[21]"After . . . hearing and such further investigations as the Board [of Permit Appeals] may deem necessary . . . the Board may concur in the action of the department authorized to *issue,* transfer or revoke the permit, or may overrule the action of said department and order that the permit be *granted,* restored, denied, or permitted to be transferred, as the case may be.'' (Municipal Code, pt. III, art. 1, § 14.) (Italics added.) "On the *issuance* . . . of any permit, any . . . person who deems that his interest or property . . . will be adversely affected . . . may appeal to the Board of Permit Appeals.'' (Municipal Code, pt. III, art. 1, § 30.) (Italics added.) "[The Board] may concur in the action of the department authorized to *issue* such license or permit, or, by the vote of four members, may overrule the action of such department and order that the permit or license be *granted,* restored, or refused.'' (San Francisco Charter, § 39.) (Italics added.)

[22]Both the San Francisco Charter and the Municipal Code afford numerous indications in addition to those noted above that the "issuance'' and "granting'' of permits are not to be viewed as equivalent. Thus, for example, section 39 of the San Francisco Charter authorizes the Board of Permit Appeals to "order that the permit . . . be . . . *refused*'' (italics added), not that it be *revoked,* as would have been more appropriate if the permit were deemed "lawfully granted'' as soon as the permit bureau had issued it.

Moreover, when a subordinate administrative agency is authorized initially to "grant'' that which an applicant seeks, an appeal from the

policy against their extension or enlargement [footnote omitted]." (*County of San Diego* v. *McClurken, supra,* 37 Cal.2d 683, 687.)[23] In light of this basic policy, we are loathe to extend the lure of statutory immunity to all who would obtain the permit bureau's preliminary approval during the inevitable interval between the enactment of a zoning ordinance and its effective date. Yet the interpretation of section 150 espoused by defendants would hold out precisely that promise of protection and would thus encourage eleventh-hour evasions of the zoning laws.

By interpreting the section to protect only those permits which have become final, however, we enable municipalities to deter the vast majority of last-minute efforts to race through

---

exercise of such authority does not ordinarily suspend the action under review but only stays proceedings in furtherance of that action. For example, section 117.3 of the San Francisco Charter and section 302(d) of the City Planning Code expressly authorize the Zoning Administrator to "grant" a requested variance when he has determined that the application therefor meets certain prescribed criteria; an appeal from his granting of a variance to the Board of Permit Appeals merely stays all proceedings in furtherance of the Zoning Administrator's action. (San Francisco Charter, § 117.3; City Planning Code, § 303(a).) Yet the Municipal Code provides that, pending appeal in permit cases, "the *action* from which an appeal is taken . . . shall be suspended." (Municipal Code, pt. III, art. 1, § 8.) (Italics added.) One must torture the words of the Municipal Code to conclude that it is the *permit*, supposedly "granted" by the permit bureau, rather than the action of that bureau in temporarily issuing the permit, which is "suspended" pending appeal. The most plausible inference is that the initial act of "issuing" a permit constitutes something less under the Municipal Code and City Charter than the ultimate "granting" of a permit.

[23]Defendants insist in this connection that the structure the developers proposed to build, though over twice as tall as the lawful limit, would not constitute a "non-conforming building." Regardless of the accuracy of this characterization, it obviously evades the principle at stake. Indeed, if labels were deemed dispositive, the defendants would be hard put to explain their reliance upon section 150 in the present case: The title of that section is "*Non-conforming Buildings and Uses, General.*"

Even as a purely technical matter, however, the argument defendants here advance is simply incorrect. The relevant section of the City Planning Code provides only that an "*existing* building which conforms to the use regulations but exceeds the height or floor area ratio limitations of this Code shall not be deemed to be a non-conforming building, but no such building shall hereafter be enlarged or structurally altered so as to further increase its height or bulk." (City Planning Code, § 120, as amended by Ordinance No. 35-64, enacted February 10, 1964.) (Italics added.) The section does *not* suggest that a structure *not yet in existence* should be deemed a "conforming" building notwithstanding its conflict with the governing height limitations. On the contrary, it expressly states that "[n]o building or structure or part thereof shall be constructed, reconstructed, altered, relocated or otherwise permitted to exceed the height and bulk regulations set forth herein for the use and height districts in which it is located." (*Ibid.*) We note in passing that

the gamut of permit procedures. Thus, upon the enactment of a new zoning ordinance, a municipality may simply set the effective date of that ordinance so that it will become operative before any permit thereafter issued becomes final.[24] Surely, section 150 was not intended to frustrate this method of discouraging the exploitation of the delays inherent in the municipal legislative process. Under the circumstances of this case, the private interest of the developers must therefore "yield to the public interest in the enforcement of a comprehensive zoning plan." (*County of San Diego* v. *McClurken, supra,* 37 Cal.2d 683, 690.)

Special Height District Ordinance No. 35-64 became effective on March 23, 1964. On that date, the permit which the developers sought had not yet been granted; after that date, no agency could lawfully grant it. Were the Board of Permit Appeals empowered to do so, a tightening of zoning regulations by legislative decree could always be nullified by administrative fiat.

We summarize here the considerations which compel our conclusion that a permit is not "lawfully granted" in the sense envisioned by section 150 until all administrative action

this language of section 120 makes no exception for the case of a building "for which a permit has been lawfully granted" (City Planning Code, § 150, subd (d)). Since we have concluded that no permit was "lawfully granted" to the developers in this case, we need not decide whether City Planning Code section 120, as amended in 1964, was intended to abrogate the exception created by City Planning Code section 150, subdivision (d), as enacted in 1960.

[24]In the instant case, for example, even if the permit bureau had issued a permit to the developers on February 11, the day after the new height ordinance had been enacted, the filing of an appeal within the following 10 days would have postponed the finality of the bureau's order for another 40 days (see fn. 11, *supra*), thereby preventing any such permit from becoming final before March 23. By providing that the ordinance would become operative on March 23, the San Francisco Board of Supervisors effectively guaranteed that no permit issued by the bureau after the new height limitation had been enacted, and subsequently challenged before the Board of Permit Appeals, could possibly become final in time to escape the operation of the new ordinance.

The Board of Supervisors might have proceeded otherwise: It might have chosen to adopt an "interim ordinance" to freeze the issuance of all building permits in the northern portion of San Francisco until the new law had become effective. (See *Hunter* v. *Adams* (1960) 180 Cal. App.2d 511 [4 Cal.Rptr. 776]; cf. *Miller* v. *Board of Public Works, supra,* 195 Cal. 477; see, generally, Note, *Stopgap Measures to Preserve the Status Quo Pending Comprehensive Zoning or Urban Redevelopment Legislation* (1962) 14 W.Res.L.Rev. 135.) The availability of that alternative, however, does not diminish the wisdom, and certainly cannot negate the validity, of the more selective course which the Board of Supervisors in fact chose to pursue on this occasion.

regarding the permit application has been completed, and that the developers' permit therefore granted no immunity under section 150: Under traditional principles of administrative law, the Board of Permit Appeals in its *de novo* review is bound to apply the zoning ordinances in effect at the time of its final decision, not those in force at the time of preliminary proceedings before any subordinate agency. Defendants have failed to demonstrate that section 150 of the City Planning Code enacted an exception to this basic rule.

 Although section 150 contemplated the protection of *final* permits against revocation pursuant to subsequent changes in the zoning ordinances, and although the section sought to eliminate the uncertainty inherent in previous rules governing such "ex post facto" revocation, section 150 did *not* create any protection for a mere *expectancy* that a pending application might be finally approved.

 Defendants' two arguments in opposition to this interpretation cannot stand. The first erroneously assumes that repeated petitions for rehearing could indefinitely postpone the effective date of a valid building permit; yet the Municipal Code precludes that possibility by fixing the date when a final order must be entered. Defendant's second argument, an attempt to equate a permit that is "issued" with one that is "granted," overlooks the separate treatment accorded those two words in the City Charter and Municipal Code: "issuance" there connotes a preliminary departmental action, whereas "granting" designates the final disposition of the matter by the Board of Permit Appeals.

Our ruling that a permit is not "lawfully granted" until the appropriate channels of administrative review have been exhausted enables cities to deter last-minute efforts to circumvent changes in the zoning laws. More broadly, our interpretation of section 150 serves to prevent the proliferation of nonconforming structures. A contrary construction of that section would subvert these objectives, both of which are vital to the achievement of order in the volatile development of modern urban centers.

For the foregoing reasons, we do not read section 150 to endow an appealable order of a subordinate administrative agency with a premature attribute of finality in disregard of the basic purpose of that section and of the City Planning Code of which it is a part.

The judgment is affirmed.

Traynor, C. J., Peters, J., Mosk, J., Burke, J., and Peek, J.,* concurred.

McComb, J.,—I concur in the judgment.

The petition of appellants HAP Development Co., Haas & Haynie Corp. and HAP Development Partnership for a rehearing was denied March 22, 1967.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.