[Civ. Nos. 13781, 13818. Fourth Dist., Div. Two. May 28, 1975.]

ARIES DEVELOPMENT COMPANY, Plaintiff and Respondent, v.
CALIFORNIA COASTAL ZONE CONSERVATION COMMISSION,
Defendant and Appellant;
RICHARD E. CHARLES et al., Movants and Appellants.

536

## COUNSEL

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, Roderick Walston, Richard C. Jacobs and Charles W. Getz, Deputy Attorneys General, for Defendant and Appellant.

Cooper, Wyatt, Tepper & Plant, Joseph L. Wyatt, Jr., and Mark Wurm for Movants and Appellants.

Barrett, Stearns, Collins, Gleason & Kinney and William N. Willens for Plaintiff and Respondent.

## OPINION

**TAMURA, J.**—These are appeals from actions of the superior court on a petition for writ of mandate filed by Aries Development Company (Aries) to review and set aside a decision of the California Coastal Zone Conservation Commission (Commission) denying Aries' claim of exemption from the permit requirements of the California Coastal Zone Conservation Act of 1972 (Coastal Act).

The Commission appeals from a judgment granting Aries a peremptory writ of mandate commanding the Commission to enter a decision recognizing Aries' claim of exemption. Richard E. Charles and Ruth J. Charles (the Charles) are owners of property adjacent to Aries' proposed development. Although they appeared in opposition to Aries before the Commission, they were not initially made parties to the mandate proceeding. However, they made a motion in the court below to vacate the judgment and have appealed from an order taking the motion "off calendar." We have ordered consolidation of the two appeals for briefing, argument and disposition.

The question presented by these appeals is whether the trial court erred in concluding that Aries is entitled to develop a parcel of land in the City of San Clemente (City) without a coastal permit.[1] The property, a 1.26-acre parcel, is located on a marine terrace overlooking the Pacific Ocean and lies within the permit area as defined by the Coastal Act. The chronology of the pertinent events is as follows:

In July 1972, Aries made arrangements to purchase the property for $225,000, the price including architectural and engineering plans for the construction of 64 apartment units on the site for which City approval had been previously obtained. However, instead of constructing apartments, Aries wanted to build condominiums. During July and August 1972, Aries had architectural and engineering feasibility studies made for the construction of 45 condominium units on the site.

In September 1972, Aries submitted to the City planning commission a use permit application, accompanied by a site plan, and a tentative tract map.

On October 5, 1972, title to the property vested in Aries and a $1,778,082 construction loan was recorded against it.

On October 11, 1972, the planning commission approved the use permit application, site plan, and tentative tract map.

---

[1]Any person wishing to perform any development in the permit area as defined by the Coastal Act must obtain a permit authorizing the development from the regional commission. (Pub. Resources Code, § 27400.) Subject to certain exceptions, the permit area extends seaward to the outer limit of the coastal zone and landward for a distance of 1,000 yards from the mean high tide line. (Pub. Resources Code, § 27104.)

On October 13, 1972, Aries obtained a permit for the demolition of an existing residential structure and for rough grading and completed the work authorized under the permit shortly thereafter.

On October 18, 1972, the City council approved the use permit application and site plan but deferred action on the tentative tract map.

On October 25, 1972, the planning commission accepted and approved an environmental impact report (EIR) on the project submitted by Aries.

On November 1, 1972, the City council took the following pertinent actions: (1) It adopted a resolution establishing interim requirements and procedures for the preparation and submission of environmental impact studies on all projects within the City; (2) it approved Aries' tentative tract map; and (3) it ordered the EIR on Aries' project be set for public hearing at the next council meeting.

On November 6, 1972, Aries received a grading permit limited to the proposed underground parking structure.

On November 7, 1972, the Coastal Act was approved by the voters of the state.

On November 15, 1972, the City council held a public hearing on the EIR for Aries' project and approved the same.

On December 14, 1972, an amended limited grading permit was issued for the underground parking structure.

On or about December 15, 1972, Aries was notified it must comply with the seismic safety element of the City's general plan.

On January 23, 1973, a building permit for construction of the condominiums was issued.

On April 13, 1973, redesigned structural plans to satisfy the seismic safety element were approved by the City.

Actual construction of the condominiums commenced on or about April 13, 1973, and continued until the Regional Coastal Commission demanded Aries either secure a coastal permit or an exemption.

Thereafter Aries submitted an exemption application and an application for a permit with the Regional Commission. The Regional Commission denied the exemption and Aries appealed that decision to the Commission. Subsequently the Regional Commission granted the permit application and the Charles appealed that decision to the Commission. The Commission denied both the permit and the claim of exemption.

The only issue raised by the petition for writ of mandate was Aries' entitlement to exemption from the permit requirements of the Coastal Act; the petition did not seek judicial review of the permit denial.

The trial court made findings of fact and concluded that by virtue of Public Resources Code,[2] sections 27400 and 27404 and "constitutional and common law principles of vested rights," Aries was exempt from the permit provisions of the Coastal Act and the Commission's denial of the claim of exemption constituted prejudicial abuse of discretion. Judgment was entered that a peremptory writ of mandate issue commanding the Commission to vacate its former decision and enter a decision recognizing the claim of exemption.

Following entry of judgment, the Charles who until then were not parties to the mandate proceeding moved to vacate the judgment. After the motion was filed, but before it was heard, the Commission filed its notice of appeal from the judgment. When the motion came on to be heard, it was ordered off calendar on the ground the movants had no standing in the case.

The Commission contends the trial court erred in concluding Aries had a vested right or statutory entitlement to construct its project without a coastal permit. The Charles contend they became parties of record by filing a motion to vacate the judgment and therefore have standing to attack the judgment for errors of law as well as on jurisdictional grounds. They assail the judgment on basically the same grounds advanced by the Commission.[3]

From the analysis which follows, we have concluded: (1) The Charles have standing to attack the judgment for errors of law and (2) the trial

[2]Unless otherwise indicated, all statutory references are to the Public Resources Code.

[3]Although the Charles raise certain additional points not raised by the Commission, in view of our disposition we need not pass upon their validity.

court erred in determining Aries was exempt from the permit requirements of the Coastal Act.

I

We first deal with the Charles' standing to attack the judgment for errors of law.

■   One who is legally aggrieved by a judgment may, though not initially a party to the action, become a party of record and obtain a right to appeal from the judgment by moving to vacate the judgment pursuant to Code of Civil Procedure section 663. (*County of Alameda* v. *Carleson,* 5 Cal.3d 730, 736 [97 Cal.Rptr. 385, 488 P.2d 953]; *Luckenbach* v. *Laer,* 190 Cal. 395 [212 P. 918]. See *Eggert* v. *Pac. States S. & L. Co.,* 20 Cal.2d 199, 201 [124 P.2d 815]; *Elliott* v. *Superior Court,* 144 Cal. 501, 509 [77 P. 1109]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 115, p. 4115.) A person whose rights or interests are injuriously affected by the judgment is a person aggrieved. (*County of Alameda* v. *Carleson, supra,* at p. 737.)

■   As property owners residing in the immediate vicinity of the proposed development, the Charles have an interest in the enforcement of land use laws affecting the quality of the neighborhood. (See *Scott* v. *City of Indian Wells,* 6 Cal.3d 541 [99 Cal.Rptr. 745, 492 P.2d 1137]; *Residents of Beverly Glen, Inc.* v. *City of Los Angeles,* 34 Cal.App.3d 117 [109 Cal.Rptr. 724]; *Tustin Heights Assn.* v. *Bd. of Supervisors,* 170 Cal.App.2d 619, 636 [339 P.2d 914].) The Charles were parties to the proceedings before the Commission and successfully opposed Aries' claim of exemption. Had the Commission decision been adverse to them, the Charles would have had the right to a judicial review of that decision. (§ 27424.[4] See *Tustin Heights Assn.* v. *Bd. of Supervisors, supra,* at p. 636.) Clearly they were injuriously affected by the judgment annulling the favorable Commission decision. We find no merit in Aries' contention that, although the Charles might have had standing if the issue had been its right to a permit, they have no standing on the issue of exemption. Indeed, given the greater potential for injury, their interests intensify where the issue is one of total exemption from the Coastal Act rather

---

[4]Public Resources Code section 27424 provides: "Any person, including an applicant for a permit, aggrieved by the decision or action of the commission or regional commission shall have a right to judicial review of such decision or action by filing a petition for a writ of mandate in accordance with the provisions of Chapter 2, (commencing with Section 1084) of Title of Part 3 of the Code of Civil Procedure, within 60 days after such decision or action has become final."

than entitlement to a permit. (See *Pettitt* v. *City of Fresno,* 34 Cal.App.3d 813, 822-823 [110 Cal.Rptr. 262].)

Aries contends that the notice of appeal filed by the Commission after the Charles' motion to vacate was filed, but before it could be heard, deprived the Charles of the right to appeal. The contention is without merit. The Charles having become parties of record by filing their motion to vacate, their right of appeal could not be destroyed by the fact that a subsequent event over which they had no control may have divested the court of jurisdiction to rule on the merits of the motion. The right accrued when the motion to vacate was ordered off calendar on the ground the movants lacked standing to bring the motion. Code of Civil Procedure section 902 provides that "[a]ny party aggrieved may appeal." Being a remedial statute, the section should be liberally construed and any doubts resolved in favor of the right to appeal. (*Koehn* v. *State Board of Equalization,* 50 Cal.2d 432, 435 [326 P.2d 502].) When the appellant is acting in good faith, the right should not be denied on purely technical grounds.

Aries' contention that the motion to vacate was not timely filed within the 15-day period prescribed by Code of Civil Procedure section 663a[5] is likewise without substance. The time limit only applies to those who were parties of record when judgment was entered. The Charles, of course, did not become parties until the filing of their motion to vacate.

We proceed to the merits of the appeal.

## II

The Coastal Act requires the Commission and Regional Commissions to develop a Coastal Zone Conservation Plan for submission to the

---

[5]Code of Civil Procedure section 663a provides:

"The party intending to make the motion mentioned in the last section must file with the clerk and serve upon the adverse party a notice of his intention, designating the grounds upon which the motion will be made, and specifying the particulars in which the conclusions of law are not consistent with the finding of facts or in which the judgment or decree is not consistent with the special verdict, either

"1. Before the entry of judgment;

"2. Within 15 days of the date of mailing of notice of entry of judgment by the clerk of the court pursuant to Section 664.5, or service upon him by any party of written notice of entry of judgment, or within 180 days after the entry of judgment, whichever is earliest.

"The provisions of Section 1013 of this code extending the time for exercising a right or doing an act where service is by mail shall not apply to extend the time above specified.

"An order of the court granting such motion may be reviewed on appeal in the same manner as a special order made after final judgment."

Legislature no later than December 1, 1975. To prevent irreversible commitment of valuable coastal resources to uses inconsistent with the plan ultimately developed, the Coastal Act provides for an interim permit system for any development in the permit area.

There are two bases for exemption from the permit provisions of the Coastal Act. One is the vested right exemption expressly recognized by section 27404 and the other derives from the rule enunciated in *San Diego Coast Regional Com.* v. *See The Sea, Limited,* 9 Cal.3d 888 [109 Cal.Rptr. 377, 513 P.2d 129]. We shall analyze those exemptions and show that the facts in the case at bench do not bring Aries within either of them.

(a)   *The vested rights exemption.*

██   In this state, one who in good faith reliance upon a building permit performs substantial work and incurs substantial liability in connection therewith acquires a vested right to complete construction notwithstanding an intervening change in the law that would.otherwise preclude construction. (*Russian Hill Improvement Assn.* v. *Board of Permit Appeals,* 66 Cal.2d 34, 39 [56 Cal.Rptr. 672, 423 P.2d 824]; *County of San Diego* v. *McClurken,* 37 Cal.2d 683, 691 [234 P.2d 972]; *Brougher* v. *Board of Public Works,* 205 Cal. 426, 434 [271 P. 487]; *California Central Coast etc. Conservation Com.* v. *McKeon Constr.,* 38 Cal.App.3d 154, 159-160 [112 Cal.Rptr. 903].) The rule is grounded upon the constitutional principle that property may not be taken without due process of law. (See *Transcentury Properties, Inc.* v. *State of California,* 41 Cal.App.3d 835, 844 [116 Cal.Rptr. 487].)

Section 27404 codifies the vested right principle. It provides that if a city has issued a building permit before November 8, 1972, a person shall be deemed to have a "vested right," and hence not be required to obtain a permit, "if, prior to November 8, 1972, he has in good faith and in reliance upon the building permit diligently commenced construction and performed substantial work on the development and incurred substantial liabilities for work and materials necessary therefor."[6]

---

[6]In full, section 27404 provides: "If, prior to November 8, 1972, any city or county has issued a building permit, no person who has obtained a vested right thereunder shall be required to secure a permit from the regional commission; providing that no substantial changes may be made in any such development, except in accordance with the provisions of this division. Any such person shall be deemed to have such vested rights if, prior to November 8, 1972, he has in good faith and in reliance upon the building permit

In the case at bench, Aries admits it did not receive a building permit until January 23, 1973. Thus, under the express terms of section 27404, Aries did not qualify for exemption under that section.

Although the cases speak of vested rights in terms of reliance upon a *building permit* (e.g., *Brougher* v. *Board of Public Works, supra,* 205 Cal. 426, 434; *Spindler Realty Corp.* v. *Monning,* 243 Cal.App.2d 255, 264 [53 Cal.Rptr. 7]; *Anderson* v. *City Council,* 229 Cal.App.2d 79, 89 [40 Cal.Rptr. 41]), the Attorney General, both in the court below and in his opening brief on appeal, has argued the case on the assumption that a building permit may no longer be a *sine qua non* of a vested right.[7] He points out that under modern land development practices various governmental approvals are required before the issuance of a building permit, each approval pertaining to different aspects of the project, and suggests that a vested right might arise before the issuance of a building permit if the preliminary permits approve a specific project and contain all final discretionary approvals required for completion of the project.

■■■ For the reasons stated below, we have concluded that Aries did not obtain a vested right under the theory on which the case was presented in the court below. Accordingly, we leave for future consideration the question whether the term "building permit" as used in section 27404 is to be read in its literal sense or whether, if the Legislature so intended, there are any constitutional impediments to such a reading.

The trial court based its conclusion that Aries was exempt from the permit provisions of the Coastal Act on the following findings: Prior to November 8, 1972, the City had approved a use permit, specific site plan, tentative tract map and had issued grading permits; the site plan was a detailed and precise plan depicting the exact height and location of the buildings, walkways, recreational facilities, parking structures, etc.; prior

___

diligently commenced construction and performed substantial work on the development and incurred substantial liabilities for work and materials necessary therefor. Expenses incurred in obtaining the enactment of an ordinance in relation to the particular development or the issuance of a permit shall not be deemed liabilities for work or material."

[7]In his closing brief, the Attorney General for the first time urges that we should adhere to the explicit terms of section 27404. The Charles make the same argument in their closing brief, although their opening brief, like the Attorney General's, used the "final discretionary approval" test. Contentions raised for the first time in a reply brief may be disregarded. (*Robinson & Wilson, Inc.* v. *Stone,* 35 Cal.App.3d 396, 414 [110 Cal.Rptr. 675]; *Diamond Springs Lime Co.* v. *American River Constructors,* 16 Cal.App.3d 581, 609 [94 Cal.Rptr. 200].) While the issue is an important one, we are reluctant to reach it with the record in this state.

to November 8, Aries had received "all necessary discretionary approvals from the City of San Clemente necessary to complete construction of the Development"; and prior to November 8 Aries had "in good faith, and in reasonable reliance on various governmental approvals and permits . . . performed substantial lawful work on the Development and incurred substantial liabilities for work and materials necessary therefor."

We are not however, bound by those findings and conclusions. The only evidence received by the trial court was the administrative record consisting entirely of documentary material such as minutes of City council and planning commission meetings, permits, correspondence, Aries' application for exemption, Commission staff recommendations, etc. At the hearing below, there was no basic disagreement as to what was done or when it was done; the only dispute concerned the conclusions to be drawn from the pertinent undisputed facts. ■ Where the facts before the administrative body are uncontradicted, the determination of their effect is a question of law and the findings and conclusions of the trial court, whether the scope of review be the substantial evidence or independent judgment test, are not controlling on appellate review. (*David Kikkert & Associates, Inc.* v. *Shine,* 6 Cal.App.3d 112, 116 [86 Cal.Rptr. 161]. See *People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville,* 69 Cal.2d 533, 543 [72 Cal.Rptr. 790, 446 P.2d 790]; *Automatic Canteen Co.* v. *State Board of Equalization,* 238 Cal.App.2d 372, 381 [47 Cal.Rptr. 848]; *Caro* v. *Savage,* 201 Cal.App.2d 530, 541-542 [20 Cal.Rptr. 286].) We recognize it has been held that where the undisputed facts bearing on a disputed issue do not point in any one direction an appellate court is bound by an inference drawn by the trial court. (*Lacy* v. *California Unemployment Ins. Appeals Bd.,* 17 Cal.App.3d 1128, 1135 [95 Cal.Rptr. 566].) However, that is not the situation here. Resolution of the issues before us does not require the drawing of any purely factual inferences, but rather the application of law to the pertinent uncontradicted facts. Otherwise stated, our function is to determine the proper legal characterization of those facts. **(4b)** Unlike *Lacy,* the evidence in the case at bench is neither sparse nor ambiguous. When the appropriate legal standard is applied to the facts in their proper sequence, it is apparent that this is in no sense a borderline case but rather one which may properly be resolved as a matter of law.

(1) Prior to November 8, Aries had not received all discretionary approvals necessary to proceed with construction.

Aries contends that final discretionary approval was received on November 1, when its tentative tract map was approved by the City council. However, the EIR for the project was not approved until November 15 and consequently, as will be demonstrated, final approval of the project could not have been given prior to that date.

As shown by the minutes, the City council, at its meeting of October 18, 1972, approved Aries' use permit application but deferred action on the tentative tract map despite Aries' plea to approve the map subject to later submission and approval of an EIR. During the meeting the mayor warned Aries that in light of the recent Supreme Court decision (*Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], Sept. 21, 1972), approval of the map without an EIR might well result in stoppage of the development in midstream.

Thereafter Aries submitted an EIR to the planning commission and the commission approved the same on October 25, 1972.

On November 1, 1972, the City council, as heretofore noted, adopted a resolution requiring EIRs on all projects within the City and establishing procedures for their preparation and evaluation. Under the resolution EIRs were to be first submitted to the planning commission for approval, subject to appeal to the City council; and if the City council was dissatisfied with the planning commission's action, or if the project was one of wide public interest, it might order the matter set for public hearing before the council. At that meeting the council approved the tentative tract map but voted to set the EIR for public hearing at its November 15 meeting.

On November 15, 1972, following public hearing on the EIR for Aries' project, the report was approved.

Approval of an EIR is a discretionary act. (See *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, 263, fn. 8; *No Oil, Inc.* v. *City of Los Angeles,* 13 Cal.3d 68, 79, fn. 8 [118 Cal.Rptr. 34, 529 P.2d 66].) It necessarily follows that approval of the tentative tract map and site plan was not final until the EIR had been considered and approved by the council. So long as the City retained discretion to approve or disapprove the project, prior approval of the tentative map and site plan was not the final exercise of the City's authority over the project. (*People* v. *County of Kern,* 39 Cal.App.3d 830, 838 [115 Cal.Rptr. 67].) Indeed, recent

decisions have confirmed the apprehension expressed by the mayor at the October 18 meeting; council approval of the tentative tract map on November 1 without prior consideration of an EIR was invalid. (*No Oil, Inc.* v. *City of Los Angeles, supra,* at pp. 79-81; *Rosenthal* v. *Board of Supervisors,* 44 Cal.App.3d 815, 824 [119 Cal.Rptr. 282].) The EIR was a city and state requirement and there was no final approval until its consideration and acceptance on November 15.

Aries relies upon section 21169 enacted as part of the December 5, 1972, urgency amendment to the CEQA. That section provides in pertinent part: "Any project . . . undertaken, carried out or approved on or before the effective date of this section and the issuance by any public agency of any lease, permit, license, certificate or other entitlement for use executed or issued on or before the effective date of this section notwithstanding a failure to comply with this division, if otherwise legal and valid, is hereby confirmed, validated and declared legally effective. . . ." Aries argues that approval of the tentative tract map on November 1, 1972, without prior City council consideration and approval of an EIR, was validated by section 21169.

Aries' reliance on the validating provisions of section 21169 is misplaced. In the first place, the section only validated permits issued before December 5, 1972, "if otherwise legal and valid." In view of the City resolution requiring EIRs on all projects within the City, its approval of the tentative tract map before consideration and approval of an EIR was in violation of the City's own rules and was therefore not "otherwise legal and valid."

In the second place, in determining whether Aries acquired a vested right before November 8, 1972, its conduct must be evaluated according to circumstances prevailing before that date. Until section 21169 was passed by the Legislature and became effective, full compliance with *Friends of Mammoth* was a requirement of state law without which there could be no final discretionary approval.

Aries' reliance upon *People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville, supra,* 69 Cal.2d 533, is misplaced. The issue in that case was the meaning of the word "project" as used in the "grandfather clause" of the McAteer-Petris Act; it did not involve the issue of vested rights.

(2) Even if we accept, for the sake of argument, Aries' contention that the November 1 approval of the tentative tract map was a final

discretionary approval, Aries did not act in good faith reliance on that approval.

Once a right has vested, its impairment or destruction must comport with constitutional principles. However, acquisition of the right is grounded on equitable principles of estoppel. (See *Spindler Realty Corp.* v. *Monning, supra,* 243 Cal.App.2d 255, 269; *Anderson* v. *City Council, supra,* 229 Cal.App.2d 79, 89.) ■ In other words, an owner of property acquires a vested right to construct a building only where the conduct of the government amounts to a representation that such construction is fully approved and legal, subject only to minor alterations, and in reliance on such representation the owner materially changes position. Good faith reliance on a governmental permit is essential to the acquisition of a vested right. (§ 27404; *Russian Hill Improvement Assn.* v. *Board of Permit Appeals, supra,* 66 Cal.2d 34, 39.)

■ The uncontradicted facts can lead to but one conclusion, that any work performed by Aries before November 8 was not done in a good faith belief that all final discretionary approvals for the project had been obtained. Rather, it appears without question that Aries entertained substantial doubts about its legal position, that the government did not lull Aries into believing it had received the final green light, and that Aries speeded up its timetable in a calculated effort to escape impending state land-use controls.

The minutes of the City council meeting of October 18, 1972, record a statement by Aries imploring the council to at least issue a grading permit by October 20, basing the urgency on the impending November 7 election on Proposition 20 (the Coastal Act).

On November 3, 1972, the president of Aries wrote to the City engineer informing him that a grading bond had been filed and requesting issuance of a permit in accordance with the understanding with the City that the permit be limited to the parking structure only, be subject to modification, and be issued under a hold harmless agreement. Under the hold harmless agreement, Aries was offering to indemnify the City for any liability the City might incur if it failed to comply with the law. In other words, far from relying on the conduct of the City, Aries was asking the City to rely on its assurances.

On November 6, 1972, the City engineer issued a grading permit "only for the parking structure," with the express proviso that it "*does not*

*constitute approval of the general development or general grading proposed or to be proposed* but recognizes only that the parking structure would be an integral function of any structure constructed on this project" and that *"further permits will be required* for extension of grading beyond the parking structure area." (Italics supplied.)

On the very day the November 6 grading permit was issued Aries entered in its records a prepayment or liability of $28,300 for grading work thereunder. One who proceeds with "unseemly haste" bears a risk "that his conduct might bear the stigma of bad faith." (*Russian Hill Improvement Assn.* v. *Board of Permit Appeals, supra,* 66 Cal.2d 34, 39; fn. omitted.) Aries' entire conduct bears the indelible stamp of "unseemly haste" and lack of good faith.

(3) Finally, if we assume, again for the sake of argument, that final approval was given on November 1, Aries did not perform substantial lawful work and incur substantial liabilities therefor between that date and November 8, 1972.

The trial court made a general finding that Aries expended and incurred liabilities in the total sum of $353,912.11 before November 8. However, most of that sum was for land purchase, architectural and other planning expenses, demolition of an existing structure, and rough grading. All of those activities were completed before November 1 and are therefore irrelevant for the reason they could not have been undertaken in reliance on a final discretionary government approval yet to be obtained. (See *Anderson* v. *City Council, supra,* 229 Cal.App.2d 79, 89-90.) ██ "[O]ne who is not yet armed with a presently effective municipal license to proceed with construction must assume the risk that, 'before final action [has] been taken on [his] application' [citation], the law might be changed so as to require that his application be denied." (*Russian Hill Improvement Assn.* v. *Board of Permit Appeals, supra,* 66 Cal.2d 34, 40.)

██ The only expenditure or liability incurred after the November 1 approval was the $28,300 prepaid or incurred on November 6 under the November 6 grading permit. Even as to that sum, Aries listed it as being for grading work performed between November 6 and November 15. Consequently, only a small portion of the sum could have been allocable to work performed before November 8. Furthermore, all grading performed under the November 6 permit was not lawful. Although the trial court found that between November 6 and November 15 Aries

graded 20,000 yards of dirt in preparation for the parking structure and also graded 80 percent of the property removing 40,000 yards of dirt, the November 6 permit was limited to an estimated 15,000 yards of dirt. The permit expressly provided that it was not a general grading permit. Thus, a substantial portion of the $28,300 incurred for grading work between November 6 through November 15 was not for lawful work. For a project estimated to cost $2,263,333, the *lawful* work performed and liabilities incurred therefor before November 8 were insubstantial as a matter of law.

For the foregoing reasons, we conclude Aries was not entitled to an exemption under section 27404 or under any other common law or constitutional principle of vested right.

(b)   *The See The Sea exemption.*

■   We next consider whether Aries was exempt from the permit provisions of the Coastal Act under *San Diego Coast Regional Com.* v. *See The Sea, Limited, supra,* 9 Cal.3d 888.

In *See The Sea* the developer received a building permit on December 6, 1972, for the construction of a condominium in the permit area and, prior to February 1, 1973, demolished an existing building, expended $79,000 in construction work and incurred financing charges. The court held the developer was entitled to complete construction without a coastal permit.

The court was confronted with the problem of harmonizing section 27404, discussed in the preceding section of this opinion, with section 27400, which provides in pertinent part: "On or after February 1, 1973, any person wishing to perform any development within the permit area shall obtain a permit authorizing such development from the regional commission. . . ."

The court declined to interpret section 27404 as requiring all persons not having a vested right before November 8, 1972, to obtain a coastal permit. Rather, it held that the Coastal Act was not intended to operate as a moratorium on all construction lawfully commenced before, but completed after, February 1, 1973, and therefore the language of section 27400 that "any person wishing to perform any development" after February 1, 1973, shall secure a coastal permit refers only to those

persons who had not commenced lawful construction on February 1, 1973.

In response to the contention that this would render section 27404 pointless, the court stated: ". . . the argument misconstrues section 27404. Although that section provides exemption for some not coming within the permit requirement, it also exempts some who do; for example, those who acted in reliance on a building permit obtained prior to the effective date of the act, and demolished structures or incurred substantial expenses and liabilities preparatory to construction." (9 Cal.3d 888, at p. 893; fn. omitted.) If we understand the decision correctly, it means a person does not qualify for the *See The Sea* exemption by demolishing buildings or performing work *preparatory* to construction. One must have actually commenced construction pursuant to a building permit before February 1, 1973.

In the case at bench, the only work performed before February 1, 1973, consisted of demolition of an existing structure, rough grading, and limited grading for the parking structure. Demolition of the structure and rough grading were merely preparatory work and, hence, did not constitute construction under *See The Sea* rationale. What little lawful work was performed under the November 6 grading permit was, as we have seen, insubstantial as a matter of law. Work performed beyond the limits of the November 6 grading permit was unlawful and, hence, could not qualify as construction under the *See The Sea* exemption.

In any event, the most that Aries would be entitled to perform under its grading permits would be the completion of the work authorized by those permits. (*Environmental Coalition of Orange County, Inc.* v. *A VCO Community Developers, Inc.,* 40 Cal.App.3d 513, 523 [115 Cal.Rptr. 59].) Under the express provisions of the Uniform Building Code, a "holder of such permit shall proceed at his own risk without assurance that the permit for the entire building or structure will be granted." (Uniform Building Code, §§ 7006(g) and 302(a).) Work performed under the grading permits before February 1, 1973, does not entitle Aries to go forward with the construction of the project in its entirety.

Judgment is reversed. Appeal from the order on the motion to vacate the judgment is dismissed as moot.[8]

---

[8]Reversal of the judgment renders moot the question whether the Charles' motion to vacate should have been granted. (Cf. *County of Alameda* v. *Carleson, supra,* 5 Cal.3d 730, 736, fn. 4.)

Kaufman, J., concurred.

**GARDNER, P. J.**—I dissent.

Roscoe Pound once wrote, "To justify an elaborate dissenting opinion the question of law should be one of at least considerable importance." (Pound, *Cacoethes Dissentiendi: The Heated Judicial Dissent* (1953) 39 A.B.A.J. 794.) This case presents but an application of existing law to a particular factual situation.[1] Since it does not present any question of law ·of importance, I shall attempt to keep my discussion brief.

My disagreement with the majority is on a rather simple issue—the scope of appellate review. As I understand the rule, if the evidence is without conflict and the decision depends on inferences therefrom, this court is not at liberty to draw its own inferences and decide a case the way we think it should be decided. Where different inferences may reasonably be drawn from undisputed evidence, the conclusions of the trial judge must be accepted by this court. In this case there is no dispute as to the basic facts. From them the trial judge drew reasonable inferences which were favorable to the respondent. The majority simply disagrees with these inferences, calls them a "question of law" and comes to a contrary conclusion. In so doing, I respectfully submit that the majority has simply retried the case—a luxury not afforded this court under our judicial system. Unfortunately, this is a rather common practice which is being used increasingly by result-oriented reviewing courts.

Unless we start with the assumption that all land development is "bad," there is really nothing very startling about the chronology of events outlined in this case. Even before the Coastal Act, building practices had become quite sophisticated and complicated. No longer does the builder simply go to the city hall with his plans and specifications, have them stamped "approved" and begin building. Building today is a long, involved, drawn out process. Yet the majority read the passage of events· in this case into a headlong dash to beat the target date of the Coastal Act.

---

[1] This particular factual situation—the position of those developing land on the California shoreline at the time of the enactment of the California Coastal Zone Conservation Act of 1972—was a matter of considerable import three years ago. Now, except for a few cases laboriously working their way through the appellate process, this is a dead issue.

Sometime prior to 1970, plans had been made for a 64-unit apartment house on the property in dispute. These were approved and, prior to Aries' purchase of the land, Aries was advised that they could proceed to construct the apartment house. Obviously, they now wish they had—and a 64-unit apartment house would now be standing on the disputed land. However, in July 1972, Aries began to consider the possibility of reducing the density from 64 to 45 units and developing the property for condominium purposes. This apparently met with the enthusiastic approval of the City. Therefore, in October 1972, Aries purchased the land for $225,000 of which purchase price $80,000 represented architectural and engineering plans for the apartment house. At that point, $80,000 went down the drain but this was a calculated decision by Aries who assumed that they were going to be able to go ahead with the condominium concept. Thereafter, the chronology set forth in the majority opinion followed and the end result was that as of November 8, 1972, Aries had made expenditures and incurred liabilities of over $353,000, and as of February 1, 1973, the total amount was over $470,000.[2]

The point of these observations is that this is no trifling matter from a fiscal standpoint. Aries may be a land developer and a soulless corporation, but its stockholders have lost a lot of money—all expended, the trial court found, in a good faith effort to develop this land with the full approval of the City of San Clemente—and stopped improperly by the Coastal Commission. The trial court found that prior to November 8, 1972, Aries, in good faith and in justifiable reliance on the approvals and permits from the City, had diligently commenced construction of the development, performed substantial lawful work thereon, and incurred substantial expenses and liabilities for the work and materials necessary for construction, and that as of February 1, 1973, Aries had commenced and performed substantial lawful construction on the development. From this, the trial court concluded that pursuant to sections 27400 and 27404 of the Public Resources Code, and, additionally, pursuant to constitutional and common law principles of vested rights, Aries' development was exempt from the permit requirements of the Coastal Act.

---

[2] For their efforts Aries now has a piece of land with a hole in it. This land originally cost $225,000 but of that cost $80,000 was for architectural and engineering plans. A $60,000 home had been demolished. So by my primitive arithmetic for their $470,000 expenditure, Aries now have a lot which would be worth about $85,000 without the hole in it.

I shall not attempt to go through the whole majority opinion and take issue with each of the conclusions reached therein. However, a few brief comments will suffice.

(1) The environmental impact report.

At the November 1, 1972 meeting, the City council *did* approve Aries' tentative tract map. It is true that at that meeting the City adopted a resolution requiring EIRs on all projects within the City. However, it must be remembered that on October 2, an EIR was submitted to the City planning commission even though there was no City ordinance calling for such a study and on October 25 that EIR was accepted by that body. Then *after* approving the tentative tract map on November 1, 1972, the City council approved the EIR on November 15, 1972. I find the majority's removal of this situation from section 21169 of the Public Resources Code strained and an exaltation of form over substance.

(2) Good faith.

The trial judge found good faith—the majority, apparently as a matter of law, finds bad faith. The majority finds that Aries "speeded up its timetable in a calculated effort to escape impending state land-use controls," because on the "very day" Aries received its grading permit it incurred a liability of $28,300 for grading work and commenced work promptly. This, according to the majority, amounts to "unseemly haste." Certainly, Aries was in a hurry. They were obligated on a construction loan of $1,778,082. For months they had worked diligently with the City ironing out the wrinkles in an effort to get this operation off the ground. Simple business prudence dictated that the development proceed as expeditiously as possible. As Aries states, if their only concern was beating the deadline of Proposition 20, it could have proceeded on the previously approved plans for the 64-unit apartment.

In words of one syllable, on uncontradicted facts the trial judge drew an inference of good faith. On the same facts, this court now draws an inference of bad faith. This, I submit, we are not at liberty to do.

(3) The performance of substantial work and the incurrence of substantial liabilities.

It is true that of the total of $353,912 expended before November 8, 1972, most was spent for land purchase, architectural, engineering and

other planning expenses, demolition of the existing structure and rough grading. All of these activities were completed before November 1. However, I think that labeling them as "irrelevant" is a trifle harsh. This was all part of an ongoing program aimed at developing the property. It is true that these expenditures "could not have been undertaken in reliance on a final discretionary governmental approval yet to be obtained." Nevertheless, I do not think we should just disregard them and label them as being irrelevant. They exist, they are part of the overall picture.

The "only" expenditure or liability incurred before November 8 in reliance on a final discretionary governmental approval was the $28,300 laid out for grading. This was the "only" item because that was the "only" item in Aries' timetable of construction which fell due during that particular period. This was an expenditure which was vital to the overall development and I cannot join in a finding that it was insubstantial as a matter of law. The trial judge took a more realistic view and evaluated the grading job in its entirety. I note that the grading job, when it was finally completed on November 14, was for a total cost of $65,000. The majority complains that this grading was done in excess of the permit. Perhaps so, but the City engineer said that Aries "did in good faith proceed with the grading." The trial judge so found. Under applicable rules of appellate review, I cannot argue with that finding.

(4) The *See the Sea* exemption.

Here, we advance the target date to February 1, 1973. As of that time the existing structure had been demolished, lawful grading completed and limited grading for the parking structure completed. The majority finds that since the demolition and rough grading were merely "preparatory" and the work done on the grading permit for the parking structure "insubstantial as a matter of law," this exemption is not available. But what actually happened?

Prior to February 1, Aries had submitted and approved a tentative tract map, had received a use permit, a demolition permit, a rough grading permit, a final grading permit, an approval of an EIR and a building permit for the entire development. A home of the approximate value of $60,000 had been demolished. The entire property had been cleared and rough graded, a hole for the parking structure excavated and 20,000 yards of dirt removed and exported. Eighty percent of the dirt on the site was removed and replaced to satisfy soils engineering require-

ments and to stabilize the site pursuant to the design of the proposed building. Subsurface draining facilities were installed to release any potential ground water and subcharge pressures as requested by the City of San Clemente. Shoring for a 20-foot-high cut to retain the street and protect contiguous property was installed, and the main gas line and water and power facilities were relocated. All of the above had been performed pursuant to various permits and other governmental approvals.

The trial court found that this was lawful construction and from all of the above drew the reasonable inference that substantial lawful construction on the Aries' project had commenced by February 1, 1973. Again, under applicable rules of appellate review, I cannot argue with that inference.

I would affirm the judgment.

A petition for a rehearing was denied June 18, 1975, and respondent's petition for a hearing by the Supreme Court was denied July 23, 1975. Clark, J., was of the opinion that the petition should be granted.