**Miyuki MURPHY, et al., Plaintiffs,**

v.

**CITY OF LONG BEACH, et al., Defendants.**

**No. CV–84–5383–JSL.**

United States District Court, C.D. California, Los Angeles Division.

Nov. 6, 1987.

Joseph H. Duff, Los Angeles, Cal., for plaintiffs.

William A. Reidder, Deputy City Atty., Long Beach, Cal., for defendants.

MEMORANDUM OPINION ON MOTION FOR JUDGMENT NOTWITHSTANDING VERDICT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

LETTS, District Judge.

**I. PROCEDURAL BACKGROUND**

This matter is before the Court on plaintiffs' motion for judgment notwithstanding verdict pursuant to Fed.R.Civ.P. 50(b) or, in the alternative, for a new trial pursuant to Rule 59(a). After careful review of the briefs and arguments of counsel and sub-

stantial independent review and consideration, the Court has concluded that the jury's verdict cannot stand.

The case involves the fatal shooting of plaintiffs' decedent Edward Murphy by Long Beach police officer Gordon Collier. The plaintiffs are Murphy's widow, Miyuki Murphy, and his surviving children, Clifton Murphy and Lillian Murphy. The defendants are Collier, his supervisor at the scene of the shooting, Sergeant Raymond Nelson, and the City of Long Beach. The Court entered a directed verdict at the close of the plaintiffs' evidence in favor of an additional defendant, officer Joseph Rabe.

Plaintiffs brought suit in this Court under 42 U.S.C. Section 1983. They alleged in Count One that Collier's fatal shooting of Murphy violated the fourth, fifth and fourteenth amendments of the Constitution of the United States because it was proximately caused by an unreasonable search of Murphy's residence and by the use of excessive force against his person. In Count Two, plaintiffs alleged a state law cause of action for wrongful death based upon either intentional, wanton and reckless, or negligent conduct. In Counts Three and Four, plaintiffs claimed damages for infliction of emotional distress based upon the same alternate theories of conduct. The jury found for defendants on all four counts.

## II. MOTION FOR JUDGMENT NOTWITHSTANDING VERDICT

Jury verdicts are entitled to the utmost respect from reviewing courts. If the verdict is not supported by substantial evidence, however, the Court may grant judgment notwithstanding the verdict pursuant to Fed.R.Civ.P. 50(b). *Transgo, Inc. v. AJAC Transmission Parts Corp.*, 768 F.2d 1001, 1014 (9th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). Judgment notwithstanding the verdict is appropriate if the evidence permits only one reasonable conclusion. *Peterson*

*v. Kennedy*, 771 F.2d 1244, 1252 (9th Cir. 1985), *cert. denied* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). In making the determination, the Court may not weigh the evidence and must draw all reasonable inferences from it in favor of the verdict winner. *Id.*

The Court is satisfied that the jury's verdict on plaintiffs' constitutional claims in Count One was reasonable. The verdict as to this count must be sustained and requires no further discussion.

Similarly, as to both individual defendants, the jury's verdict with respect to plaintiffs' theories of liability for intentional or reckless and wanton conduct in Counts Two, Three and Four was reasonable. The jury's verdict on these theories must also be sustained.[1]

The issue to be re-examined therefore is not whether the individual defendants acted maliciously or abused their lawful authority. The sole remaining question is whether the defendant officers were sufficiently at fault in causing Murphy's death that the City of Long Beach should compensate Murphy's family for losses suffered as a result.

Murphy had a gun in his hands at the time he was killed. The jury could and obviously did infer that Collier fired the fatal shot reasonably believing it to be necessary in his own defense. The jury could not conclude, however, that Murphy's act of rising from the table with his gun in his hands, without more, was negligent. Under California law, a person may use a reasonable amount of force if it appears necessary for that person's protection. Cal.Civ.Code Section 50 (West's 1982); *see People v. Enriquez*, 19 Cal.3d 221, 229, 137 Cal.Rptr. 171, 561 P.2d 261 (1977). The undisputed facts show that when Murphy picked up his gun, the police had given him considerable reason to believe that they were trespassers who might well be dangerous. The police were standing in the dark just outside a window that was only approximately twelve feet from where he

---

1. It is hard to distinguish between reckless or merely negligent conduct in this case. Even if the the conduct were deemed to be "reckless," however, it should not support punitive damages.

**502**

stood inside his house. They had made noise, alerting Murphy, and, until after he had picked up his gun, the police had made no effort to identify themselves.[2]

From here, the issues are straightforward. The Court must determine, on the basis of facts and inferences most favorable to the defendants: (a) whether a reasonable jury could conclude that the conduct of defendants, which culminated in a gunpoint confrontation with Murphy before they had identified themselves as police, was not negligent; and (b) whether a reasonable jury could believe that Murphy was comparatively negligent by failing to drop his gun once he had risen from the table.

### A. Defendants' Negligence

■ Reduced to essentials, the relevant facts are simple and uncontroverted. At approximately 10:45 p.m., police were dispatched to the scene on a "man with a gun" call. Six uniformed officers responded, four of whom carried loaded shotguns. Nelson, the supervisor at the scene, was wearing a "beach" uniform, the top of which is a white polo shirt with an appliqued badge. The other officers wore standard dark blue uniforms.

Upon the officers' arrival, Murphy's neighbor, who had made the call to the police, asked the officers to contact Murphy and to get him not to come outside again with his gun. Nelson decided to have Rabe go to Murphy's door and talk with him. He directed other officers to cover Rabe during his approach to the door and subsequent conversation with Murphy, if any, by surrounding the house. While Rabe approached the "front" door located on the side of the house, Collier crossed Murphy's yard to a position at Murphy's front window, from which he could see into Murphy's dining room.

Once in position, Collier saw Murphy seated approximately twelve feet away with his gun on the table before him. Although he was inside his house, Murphy was separated from Collier only by an open, screened window. Collier backed away from the window, snapped his fingers to get the attention of other officers and said, "The gun is on the table." He spoke loudly enough for officers who were at least as far from him as Murphy to hear.

Collier returned to the window and pointed his gun at Murphy to achieve a "position of advantage" over Murphy in the event Murphy commenced any aggressive action. Collier stood so that most of his body was behind the wall to the left facing the window. Nelson then stepped forward, from a position to Collier's rear and left, and asked, "Where's the gun?" As he spoke, Nelson moved around Collier to a position directly in front of the window. Immediately after Nelson spoke, Murphy seized the rifle from the table, started to rise, and said "Who's outside my house?"[3]

Nelson's plan, to the extent he had one, called for Murphy to learn of the police presence for the first time when Rabe knocked and announced himself. Had the officers carried out this plan successfully, the expected result was that Murphy would answer the door and a peaceful conversation would ensue. By speaking in audible tones before Rabe reached the door, however, Collier and Nelson caused this plan to abort.

Although Murphy obviously was unable to testify so, the defendants' testimony about the sequence of events makes clear that Murphy picked up his gun and rose from the table because he heard voices and perhaps other sounds. Had the defendants exercised ordinary care in executing their plan, this would not have happened. Since Collier already had his gun pointed at Mur-

**2.** Murphy also had no reason to suspect that the people outside his house might be police officers. He had done nothing that could lead him to suspect that if the police wanted to talk to him they would surround his house with officers who had their guns drawn. Although he had taken his gun into the street earlier in the evening, this was not a crime and Murphy had no criminal record. Moreover, the record does

not suggest that he knew he had been seen, much less reported to the police.

**3.** Murphy could easily have interpreted Nelson's question to refer to a gun other than Murphy's own gun, giving Murphy more cause for concern.

phy, the result of defendants' negligence was a gunpoint confrontation—at virtual point blank range—between two people, each of whom reasonably believed that he had the right to defend himself. After this point, a shooting was inevitable unless the police could successfully identify themselves to Murphy before they had to shoot.

The defendants' claim that it was reasonably necessary for Nelson to inform the others of the whereabouts of Murphy's gun. This claim, however, does not establish that it was necessary to do so in tones audible to Murphy, nor does it provide any justification for Nelson's follow-up inquiry which appears to have triggered Murphy's response. The only reasonable conclusion from the evidence was that the defendants were negligent in causing Murphy to pick up his gun, which ultimately led to his death. To the extent that the jury's verdict must be taken as a determination that the defendants were not negligent, therefore, it must be overturned.

### B. *Murphy's Comparative Negligence*

■ The remaining question is whether a finding that Murphy was comparatively negligent has basis in defendants' evidence.[4] California applies the doctrine of comparative negligence, which reduces a negligent defendant's liability in proportion to the plaintiff's fault. *Li v. Yellow Cab Co. of California,* 13 Cal.3d 804, 119 Cal. Rptr. 858, 532 P.2d 1226 (1975). If Murphy was negligent, the jury verdict exonerating defendants from all liability would only be in accordance with California law if it determined that Murphy's negligence exceeded that of the defendants. Since there was no instruction that allowed the jury to find that Murphy's negligence was greater than defendants', if Murphy could be found to be comparatively negligent at all, there is no alternative but to order a new trial.

The defendants contend that before Collier fired the fatal shot, Rabe knocked at Murphy's door and announced "Police" and that Collier and Nelson had yelled, *"Police! Drop the gun!"* from their positions outside the window. Rather than put down the gun, however, Murphy turned toward the window at which Collier and Rabe were standing, raised his rifle to his shoulder, took a deep breath, aimed, and leaned forward as if to fire. Only then, according to defendants' testimony, did Collier fire.

Defendants contended at trial that no reasonable person, confronted with armed police officers who had identified themselves in clearly audible voices, would raise a rifle and try to shoot them. They theorized that Murphy did so because he was so severely intoxicated that either he could not comprehend that the police were who they claimed to be or, when he decided to shoot, he did not care who they were.[5] There seems little doubt that the jury's verdict was based in large part, if not entirely, upon its acceptance of this theory.

By focusing only on the fact that Murphy was drunk at the time, the defendants distorted the true issue. Intoxication, no matter how severe, is not negligence *per se.* Prosser and Keeton on Torts 178–79 (5th ed. 1984). The proper question is whether, in light of what went on immediately before and after Murphy picked up his gun, a reasonable person could have been expected to respond differently. Defendants contend that a reasonable person would have put the gun down. The question posed is whether this is a contention that a reasonable jury could accept on these facts.

This Court thinks not. Only seconds elapsed between the time when Nelson asked "Where's the gun?" and when Collier shot and killed Murphy. These seconds

---

4. Evidence establishing comparative negligence might also be deemed to establish that Murphy's actions constituted an "intervening cause" which would absolve the defendants from liability for their negligence. *See* Prosser and Keeton on Torts 452 (5th ed. 1984). Since the principles of this contention for present purposes do not differ from those involved in comparative negligence, however, intervening cause will not be discussed separately.

5. In support of this theory, defendants produced evidence that at the time he was shot, Murphy's blood alcohol level was 0.28 percent and expert testimony that at that level it would be reasonable to expect severe impairment of judgment.

---

**504**

began and ended with Murphy in a life or death crisis. They began when Collier pointed his shotgun at Murphy and ended when Collier pulled the trigger. This crisis was produced solely by defendants' negligence. The law recognizes that it asks too much to require a reasonable person to respond immediately and to weigh alternatives accurately in a moment of crisis resulting from the negligence of others. *Leo v. Dunham,* 41 Cal.2d 712, 714, 264 P.2d 1 (1954); *Schultz v. Mathias,* 3 Cal.App.3d 904, 913, 83 Cal.Rptr. 888 (1970). The crisis itself produces risk of reasonable error even if the originally negligent party does nothing thereafter to make it worse.

Here, however, defendants did make it worse. Virtually all of the information that Murphy had when the crisis started and all that was added in the brief seconds before it ended was destined to make Murphy respond inaccurately. Murphy had every reason to believe he might need his gun at the time he seized it in order to protect himself from trespassers who, although outside his house, were very near to him. At this time, Murphy had no reason at all to suspect that the apparent trespassers actually were police officers. Even if nothing had happened later to add further confusion, it would be hard to conclude that a reasonable person in Murphy's position, hearing a command "Police! Drop the Gun!" coming from the dark outside, would simply obey. If he did so and was wrong, he would have given away his only chance to defend himself.

After Murphy picked up his gun, however, the police made matters even worse. Rabe, after knocking and announcing "Police" in a matter of fact tone, did not remain at the door and wait for Murphy to answer the knock, as Murphy would surely have expected. Instead, he moved away from the door, stumbled, fell loudly, and then scrambled away to a new position. It was only as Rabe scrambled away that Nelson and Collier, according to their testimony, began shouting "Police! Drop the gun!"

Nothing in the evidence suggested that Murphy could see anything outside the window except the barrels of two shotguns. The other most visible thing near the window was Nelson's white polo shirt which, as the only article of clothing which was not dark blue, was most easily seen at night.

None of this could lead a reasonable person to conclude quickly that whoever was outside shouting "Police" should be believed or that the reasonable response would be to put down the gun. Experts from both sides testified that even when trained police officers unexpectedly confront each other with weapons, a shooting is likely to occur before the officers can identify themselves. As a result, according to the testimony, police expend a great deal of effort to train officers not only how to identify each other quickly but in how to avoid such situations entirely.

Murphy had not received training on how to identify police officers quickly or how to avoid shooting in self-defense. A reasonable person may not be held to a standard of care which trained experts cannot meet. Accordingly, the defendants may not be absolved of liability for their negligent acts which produced the gunpoint confrontation by asserting that a reasonable person would have responded to the situation differently. A determination that Murphy was negligent, if made by the jury, could not be sustained and the plaintiffs are entitled to have their damages ascertained and awarded on the basis of facts proved at trial.

\*    \*    \*    \*    \*    \*

## IV.   CONCLUSION

Accordingly, plaintiffs' motion for judgment notwithstanding the verdict is granted and it is ordered that a verdict be entered in favor of plaintiffs....