[No. C013547. Third Dist. Mar. 31, 1994.]

ERMA DAVIS et al., Plaintiffs and Appellants, v.
CITY OF SACRAMENTO et al., Defendants and Respondents.

**COUNSEL**

Thomas S. Crary for Plaintiffs and Appellants.

Bolling, Walter & Gawthrop and George E. Murphy for Defendants and Respondents.

**OPINION**

**PUGLIA, P. J.**—This is a wrongful death action stemming from a police shooting during the investigation of a domestic dispute. Plaintiffs appeal from a judgment for defendants following return of the jury's special verdict finding no negligence. On appeal, plaintiffs contend the court erred in restricting discovery of the personnel files of the officer who fired the fatal shot and a former officer retained by defendants as an expert witness.

Plaintiffs also contend the evidence establishes negligence as a matter of law. We shall affirm.

## I

At approximately 8 p.m. on August 24, 1986, plaintiff Alan Davis, the 21-year-old son of decedent Willie Davis, called a "911" operator and reported his parents had been arguing and decedent had gone to the garage where he kept a handgun. The operator communicated this information to three police units which responded to the scene several minutes later.

The first officer to arrive was Edward Rivera, who was flagged down by a group of people across the street from the decedent's residence. They informed Rivera decedent had been drinking, had chased somebody in the house, and had access to a gun. Rivera observed decedent moving around inside his garage. By this time, Officer Gary Kereazis had arrived on the scene. Rivera and Kereazis approached decedent's garage and Rivera asked him to come out and talk. Decedent responded by slamming down the garage door.

Officer Gary Shelley, one of the defendants herein, and his partner, Sergeant Bob Mitchell, arrived about the time decedent closed the garage door. They parked their patrol car in front of the house next door. Shelley headed for the front of decedent's residence and Mitchell for the rear. As Shelley reached the corner of the residence, he observed a hand above a side gate holding what appeared to be a handgun. Shelley yelled, "Freeze, police officer," but the individual ran toward the back of the residence. Using a police radio, Shelley advised the others what he had observed. During this time, Rivera had resumed his discussion with the individuals across the street. Rivera observed movement inside the residence and again asked decedent to come out and talk. There was no reply. Rivera asked decedent if he had a gun, to which decedent responded, "If you have one, I've got one too."

While Rivera spoke to decedent, Kereazis proceeded to the back of the residence and Shelley moved to a position near the front door where he could observe the inside. From his position near the back, Kereazis saw decedent, who appeared to be armed, standing at a bedroom window looking out. Kereazis broadcast this information on his police radio.

Shortly after Kereazis's observation, Shelley saw decedent, unarmed, standing in another area inside the residence near the front entrance. As decedent began to move toward the front door, Shelley decided to surprise

him in order to eliminate any opportunity for decedent to retrieve his weapon. Holding his shotgun at "port arms position," Shelley rushed in and again announced, "Freeze. Police Officer." Decedent turned and lunged at Shelley. Shelley hit decedent with his shotgun and knocked him on his back. The force of the blow also caused Shelley to lose his balance and Shelley found himself on top of decedent with decedent holding the end of his shotgun.

Shelley and decedent wrestled for control of the shotgun. Rivera entered and positioned himself beside them. Rivera held his weapon on decedent and tried to get him to release the shotgun. Decedent, shouting obscenities, refused to let go. Eventually, Shelley told Rivera to get out of the way so he would not get hurt and Rivera retreated to a back bedroom. Fearing for his own life, as the barrel of the shotgun was being forced in his direction, Shelley eventually directed the barrel back toward decedent and again told him to freeze. Decedent said "fuck you" and lunged upward. Shelley fatally shot him.

Plaintiffs, the wife and children of decedent, initiated this action for wrongful death against the City of Sacramento, the Sacramento Police Department, and Officer Shelley. The complaint alleges general negligence and negligent hiring and retention of Shelley. Prior to trial, plaintiffs moved for discovery of police personnel records of both Shelley and Joseph Callanan, a retired lieutenant of the Los Angeles County Sheriff's Department retained by defendants as an expert witness. The court denied the request as to Callanan but ordered an in camera review of Shelley's records. After this review, the court ordered limited disclosure from Shelley's personnel file consisting of only five pages of training records.

Because of the court's ruling on the motion to disclose Shelley's personnel file, the parties agreed the court could strike and the court then struck allegations in the complaint relating to negligent hiring and retention. The issue of general negligence was then tried and the jury returned a special verdict finding defendants were not negligent. Plaintiffs' motion for new trial was denied.

## II

█ Plaintiffs contend the court erred in denying their motion for discovery of the personnel records of defense expert Callanan. They contend such records were necessary to verify the qualifications of the expert and were not protected from discovery as official police documents.

█ "Peace officer personnel records and records maintained by any state or local agency pursuant to [Penal Code] Section 832.5 [relating to citizen

complaints], or information obtained from these records, are confidential and shall not be disclosed in any criminal or civil proceeding except by discovery pursuant to Sections 1043 and 1046 of the Evidence Code." (Pen. Code, § 832.7, subd. (a).) Article 9 of chapter 4, division 8 of the Evidence Code (§§ 1040 through 1047) governs discovery of official police information, including peace officer personnel files. These provisions take precedence over the general discovery rules outlined in the Code of Civil Procedure. (*County of Los Angeles* v. *Superior Court* (1990) 219 Cal.App.3d 1605, 1611 [269 Cal.Rptr. 187].)

■ Evidence Code section 1047 prohibits discovery of police department personnel records for officers not involved in the incident giving rise to particular litigation. It provides: "Records of peace officers, including supervisorial peace officers, who either were not present during the arrest or had no contact with the party seeking disclosure from the time of the arrest until the time of booking, shall not be subject to disclosure."

Plaintiffs contend this section does not apply to personnel records of *retired* peace officers functioning as expert witnesses. We discern no such limitation in the statutory language. Because personnel records of a particular officer are presumably generated while the officer is employed by the police department, they are "[r]ecords of peace officers." They do not cease being such after the officer's retirement. If the Legislature had intended anything different, it could easily have so provided.

Plaintiffs also contend Evidence Code section 1047 does not apply where, as here, there was no arrest. They argue the language of the provision and its legislative history suggest it was intended to apply only in a criminal prosecution, i.e., where there has been an arrest. We disagree.

Section 1047 was added to the Evidence Code in 1985 as part of an act which also amended Penal Code section 832.7. (Stats. 1985, ch. 539, § 3, p. 1917.) As previously noted, the latter provision protects peace officer personnel records from disclosure "in any criminal or civil proceeding." It is obvious the Legislature had more in mind in enacting this legislation than criminal proceedings. Although the language of Evidence Code section 1047, in particular the reference to "arrest" and "booking," tends to support plaintiffs' argument the interpretation of that provision for which plaintiffs contend would lead to absurd results. Plaintiffs cannot reasonably argue decedent would not have been arrested on one or more charges had his resistance been overcome before he was shot, or if shot, had the wound not been fatal. Application of Evidence Code section 1047 does not turn on whether a suspect survives a confrontation with police long enough to be arrested.

█ Plaintiffs contend Callanan waived his privacy rights by agreeing to serve as an expert witness and submitting his resume for scrutiny. They argue Callanan cannot rely on his employment background to qualify him as an expert and then hide behind the statute to preclude verification of his qualifications.

Plaintiffs overlook the fact that the privilege against disclosure of official police records is held both by the individual officer involved and by the police department. (*San Francisco Police Officers' Assn.* v. *Superior Court* (1988) 202 Cal.App.3d 183, 189 [248 Cal.Rptr. 297].)[1] The record indicates the Los Angeles County Sheriff's Department, where Callanan had been employed before retirement, objected to disclosure on the basis of Evidence Code section 1047. There was obviously no waiver of the department's privilege.

█ At any rate, plaintiffs were never conclusively denied access to Callanan's personnel files. In denying plaintiffs' request, the trial court suggested plaintiffs had not yet exhausted means of verifying the accuracy of Callanan's resume less intrusive on his privacy. █ ██ █ █ The court directed plaintiffs to seek the desired information through a direct request or through questioning of Callanan and invited plaintiffs to renew their motion if those methods proved inadequate.[2] The court explained: "There are many, many more less intrusive methods of verifying he is what he says he is than subpoenaing the records of the Los Angeles Police Department [*sic*].

"And until such time as you've exhausted those other methods—and I think that now that [defense counsel] is on notice that you want them, he can

---

[1] As the court explained in *San Francisco Police Officers' Assn.* v. *Superior Court, supra,* 202 Cal.App.3d at page 189: "The report by the Senate Committee on the Judiciary indicates that the main purpose of the [initial legislation establishing the official records privilege] was to curtail the practice of record shredding and discovery abuses which allegedly occurred in the wake of the California Supreme Court's decision in *Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]." By affording the employing entity a privilege of nondisclosure, the incentive for destruction of records is eliminated.

[2] Of course, to the extent the records from Callanan's personnel file were privileged, the trial court was wrong to suggest the information therein could be obtained through other means of discovery. Evidence Code section 1043, setting forth the procedure for requesting official police information, is the exclusive method for obtaining both peace officer personnel records and the information contained in them. (*Hackett* v. *Superior Court* (1993) 13 Cal.App.4th 96, 99 [16 Cal.Rptr.2d 405].) "[T]he statutes which protect personnel records and *information from such records* also protect the identical information about personnel history which is within the officers' personal recollections. There would be no purpose to protecting such information in the personnel records if it could be obtained by the simple expedient of asking the officers for their disciplinary history orally." (*City of San Diego* v. *Superior Court* (1981) 136 Cal.App.3d 236, 239 [186 Cal.Rptr. 112], italics in original.)

get in contact with the witness and say, bring everything you can to verify what you said in your resume. *And only if after there's a failure on his part to totally document what he says would we then even listen to you on it.*

". . . . . . . . . . . . . . . . . . . . . . . . .

"And—and you said that and you can take his deposition, find out how much of it you're satisfied with or not before you then go to the expense and inconvenience and intrusion on a third party, the police department, and say, we want you to produce these records." (Italics added.)

The trial court did not deny the discovery request on the basis of the official records privilege but on the basis of plaintiffs' failure first to use less intrusive means of discovery. The court deferred consideration of the privilege issue, inviting plaintiffs to renew their request if other methods proved unavailing. Because plaintiffs never renewed their request, and therefore presumably were satisfied with the discovery they were able to obtain, the issue is waived.

## III

Plaintiffs contend the court erred in denying more extensive discovery of Shelley's personnel file. After an in camera review, the court allowed discovery of only five pages of training records. Plaintiffs contend the court applied the wrong standard of review at the in camera hearing and thereby erroneously denied access to records regarding complaints against Shelley, prior shootings by Shelley and psychological evaluations. They argue such records were the only means by which to prove their negligent hiring and retention claim against defendants City of Sacramento and Sacramento Police Department.

Penal Code section 832.5, subdivision (b) requires police departments to maintain for a period of five years all records of complaints against officers by citizens or other officers. Like police officer personnel records, complaint records and the information contained therein are not subject to discovery except pursuant to Evidence Code section 1040 et seq. (Pen. Code, § 832.7, subd. (a).)

Plaintiffs' contention is premised on the unwarranted assumption the trial court made a threshold determination of relevance and good cause for production of the records at the time it ordered the in camera review. The only remaining issue, they argue, was whether the need for production was outweighed by Shelley's privacy interests. Because, after the in camera

review, the court ruled there was insufficient "good cause" for production of additional records, plaintiffs argue the court failed to balance the competing interests.[3]

Plaintiffs' contention is dependent upon a false premise. The trial court made no relevance or good cause determination in connection with its initial ruling. In its tentative decision, the court indicated simply the motion would be granted. At the ensuing hearing, defense counsel asked for clarification regarding the records to be produced. The court indicated even matters not subject to discovery should be produced in camera in order to allow the court to determine "if there's something that might indicate there's something more in there [the personnel file] that hasn't been produced."

On defendants' request to limit disclosure to incidents where a firearm was used, as opposed to the broader use of excessive force, the court responded: "I think violence is—for purposes of producing to the Court, violence may be violence. And violence by the use of fists or a billy club or a firearm may or may not be relevant and I don't think I could really say until I see them."

Plaintiffs also requested production of records which may suggest racial prejudice on Shelley's part. The court denied the request, indicating there was no "good cause" for such production because the record contains no evidence of racial motivation for the shooting. Similarly, regarding psychological records, the court indicated there was no good cause shown.

To support their premise the court made an initial relevance and good cause determination, plaintiffs rely on a passing reference by the court to the lack of good cause for the production of psychological records. After discussing evidence that there have been "a cluster of shooting incidents in which [Shelley] was involved in two fatalities and one serious wounding," the court asked defense counsel: "[I]sn't that pretty close to a showing of good cause to—to at least look at the record to see whether there is any indication in the file that there may have been some psychological problem that existed before the shooting that would cause him to be quicker on the trigger than someone else?"

This does not suggest, as plaintiffs argue, the court was making a good cause determination as to each item of evidence sought to be produced. At

---

[3] In its order following the in camera review, the court explained the basis for denying more extensive discovery as follows: "The Court finds that good cause does not exist for the disclosure of any information from any citizens' complaints against Officer Shelley regarding force or violence and further finds that good cause does not exist for the disclosure of any information from the investigation of any use of a fire arm [sic] by Officer Shelly prior to and including August 24, 1986."

most, it suggests the court was concentrating on whether there was good cause to "at least look at the record." This is clearly not the same thing as good cause for actual production and does not even hint at relevance. From the other discussions, it is clear the court was concerned with whether the records were *arguably* relevant. If so, the court ordered in camera inspection.

■ A party seeking discovery of police officer personnel records "is entitled to disclosure of only that information which the court, after conducting its *in camera* review, determines is relevant to the case." (*Herrera* v. *Superior Court* (1985) 172 Cal.App.3d 1159, 1163 [218 Cal.Rptr. 742], italics in original.) However, even relevant evidence may be excluded. Evidence Code section 1040 establishes a general privilege against disclosure of any information obtained in confidence where disclosure is forbidden by state or federal law or "is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice." Another purpose of the in camera inspection is to balance these competing interests. (*City of Santa Cruz* v. *Municipal Court* (1989) 49 Cal.3d 74, 84 [260 Cal.Rptr. 520, 776 P.2d 222].)

■ We have reviewed the transcript of the in camera proceeding and we are satisfied the court made the necessary determination of relevance as it relates to the records produced. As to records considered marginally relevant, the court properly determined good cause for production was lacking. There was no error.

## IV

■ Plaintiffs contend the judgment must be reversed because the evidence established negligence as a matter of law. They argue the expert opinion of Callanan that the officers acted reasonably should be disregarded because it "is unimaginable and defies logic and reason."

Callanan testified that 95 percent of the time a person confronted by a shotgun-wielding police officer will respond "positively," which we infer means submission to the officer. Plaintiffs argue it was not reasonable as a matter of law to rush decedent under these odds when the officers could have waited him out. According to plaintiffs, "[i]f one-in-twenty odds of violence are an acceptable criteria [*sic*] to justify police action in a situation about which the police know little or nothing, but where the information is readily available but not sought, then our society is in a sorry state."

Plaintiffs further argue Callanan's opinion becomes more suspect when considered in light of Shelley's failure to comply with the knock-notice

requirements of Penal Code section 844.[4] They argue that section is specifically designed to avoid confrontations such as occurred here.

█ Whether in a given situation a party was negligent, i.e., failed to act as a reasonably prudent person, is a question of fact for the jury. (*Diamond Springs Lime Co.* v. *American River Constructors* (1971) 16 Cal.App.3d 581, 593 [94 Cal.Rptr. 200].) "When attacked on evidentiary grounds, a finding of negligence cannot be disturbed by a reviewing court if there is substantial evidence to support it; when two or more inferences are reasonably available from the facts, the reviewing court will not substitute its own inference for the jury's. [Citations.]" (*Ibid.*)

█ The evidence at trial revealed circumstances which arguably justified Shelley's conduct. Decedent had been in an argument which caused the rest of the family to leave the residence. Shelley was informed decedent had access to a handgun, thought he saw decedent holding a handgun, heard decedent impliedly threaten Officer Rivera with a gun, and was aware decedent refused to come out of the residence to speak with the officers. When Shelley observed decedent inside the house without a handgun, he considered this an opportune moment to rush him before decedent could rearm himself.

Contrary to plaintiffs' suggestion, the officers were not obligated to "wait decedent out." On the contrary, decedent had forced the other members of his family out of the residence and the officers had a duty to restore order. It is reasonable to assume this is precisely why plaintiff Alan Davis summoned the officers.

Shelley's failure to comply with Penal Code section 844, were such compliance required under these circumstances, did not change the situation. Decedent was aware the officers were present outside his house and wanted to speak with him but he refused to come out. He was also aware of the reason for the officers' presence. This, plus the fact decedent was momentarily unarmed, distinguishes the instant matter from *Murphy* v. *Long Beach* (C.D.Cal. 1987) 696 F.Supp. 500, affirmed in part and reversed in part (9th Cir. 1990) 914 F.2d 183, a case which plaintiffs describe as "almost

---

[4]Penal Code section 844 provides: "To make an arrest, a private person, if the offense is a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing the person to be, after having demanded admittance and explained the purpose for which admittance is desired."

identical" to this one.[5] On the evidence here, had Shelley complied with knock-notice, it would only have given decedent an opportunity to rearm himself.[6]

Contrary to plaintiffs' contentions, it was for the jury to decide whether Shelley was the defendants were negligent in rushing decedent where there was a 5 percent chance he would resist. It was a jury question whether "one-in-twenty odds of violence" was something society could tolerate. The jury apparently decided it was, and we find no reason to disturb that conclusion.

The judgment is affirmed.

Sparks, J., and Sims, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 15, 1994.

---

[5]In *Murphy* v. *Long Beach, supra,* 696 F.Supp. 500, the police had been summoned by a neighbor to the house of an intoxicated man who had been seen earlier in the yard carrying a gun. When police arrived they could see the man sitting at a table inside the house. One of the officers stood outside a window with a gun pointed at the man. Other officers negligently made noise which alerted the man to their presence. The man grabbed his gun and began to rise, saying "Who's outside my house?" As a result of this gunpoint confrontation, the man was shot. (At pp. 502-503.) In *Murphy,* there was no evidence that before the confrontation the man inside the house was aware anyone was outside or that the people making noise outside were police officers. (At p. 502, fn. 2.)

[6]Plaintiffs' argument that Shelly should have waited to obtain additional information about the situation is fanciful. There is nothing in the record to suggest additional information was available or how its acquisition by Shelly would have changed things or led to a different result.